# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black">

### *People v. McIntosh*, 2021 IL App (1st) 171708

</div>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. NORMAN McINTOSH, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>No. 1-17-1708 |
| Filed | October 29, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 02-CR-3003; the Hon. Ursula Walowski, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Jennifer L. Blagg, of Chicago, for appellant.<br><br>No brief filed for appellee. |
| Panel | PRESIDING JUSTICE DELORT delivered the judgment of the court, with opinion.<br>Justices Cunningham and Connors concurred in the judgment and opinion. |

# OPINION

¶ 1    In 2004, Norman McIntosh was convicted of the first degree murder of Devon Hobson. He was also convicted of attempted first degree murder, aggravated discharge of a firearm, and aggravated battery in connection with the nonfatal shooting of James Hobson.[1] McIntosh remained incarcerated until 2016, when, at the request of State's Attorney Anita Alvarez, the circuit court vacated his convictions. Thereafter, McIntosh filed a petition for a certificate of innocence pursuant to section 2-702 of the Code of Civil Procedure (735 ILCS 5/2-702 (West 2016)). The circuit court denied the petition after a hearing. We reverse and remand with instructions for the circuit court to enter a certificate of innocence.

¶ 2                                    BACKGROUND

¶ 3    We limit our review of the criminal trial evidence to the essential question before us: the identity of Devon's killer. We omit evidence that was not probative of the shooter's identity, such as expert testimony on the subjects of ballistics and medicine.

¶ 4    James testified at the criminal trial that, at about 6:30 a.m. on November 24, 2001, he left his mother's house with Devon, his cousin Darius Thompson, and Thompson's friend Aaron Smith (Aaron). James and Devon were in their twenties at that time, and James testified that Thompson and Aaron were each about 12 years old. Armed with a revolver, the four went to "a known drug block," intending to rob people of cash and drugs.

¶ 5    James testified that they then attempted to flag down passing cars by indicating that they were selling marijuana. Within about 10 minutes, a "silverish looking [car] with a primed-up door" approached them. The color of the door was "brownish-looking." James testified that he later identified McIntosh as the man in the car, and he made an in-court identification. He testified that Devon walked up to the car, pointed the revolver at McIntosh's face, opened the car door, and demanded money. James testified that McIntosh held up his hands and told Devon that he could take everything he had. Thompson and Aaron then opened the passenger-side door and searched the car and McIntosh's pockets. The group stole several bags of cocaine, compact discs, and $20 in cash. James testified that he reached into the car and took the keys from the ignition. McIntosh then "jumped out" of the car and began to walk away. James threw the keys to McIntosh and said, "man, we don't want your car." James testified that McIntosh got back into his car, leaned out the window, and yelled that he was a member of the Vice Lords gang and that he would return to kill them. James admitted at trial that he was a member of the Black Disciples gang but testified that there was "no conflict with the Vice Lords."

¶ 6    James testified that the four then returned to his mother's house and left the compact discs there. They then left again to visit a friend. While they were walking, they noticed the car from the robbery. James testified that McIntosh then pointed a black gun out of his car window and started firing. James started to run but stopped when he saw Devon fall. James turned back and pleaded, "Man, please don't kill my brother. We'll give you your stuff back." James testified that McIntosh then shot him in the chest. James testified that McIntosh put the car in reverse

---

[1]Devon and James Hobson were brothers. Because they share a last name, we refer to them by their first names. Similarly, we refer to Aaron Smith and Charles "Eggy" Smith—no relation—by their first names.

to get closer to Devon, who was crawling away. James testified that McIntosh put the gun to the back of Devon's head and fired.

¶ 7　　James testified that he identified McIntosh in a photo array on January 9, 2002. He testified that he later identified McIntosh in a police lineup on January 18. On the stand, he was shown a photograph of the live lineup and again identified McIntosh. He noted that, in the photograph, McIntosh had "braids in his hair and [a] black hoody with a red shirt."

¶ 8　　Thompson testified next. He testified that he was 12 years old at the time of the shooting. His description of the robbery was substantially similar to James's. He testified that McIntosh, whom he identified in court, arrived in a gray, four-door car that "had a little red paint in the front." He also said, "I think it had a blue door." Thompson testified that he and the others then robbed McIntosh of $20 cash, four bags of cocaine, and several compact discs. Thompson testified that they then returned to the house and left the compact discs in Devon's room before heading back out.

¶ 9　　Thompson testified that when he spotted the same car again later that morning, he told his cousins, "Here comes that guy we robbed earlier." He testified that McIntosh rolled down the window, pointed a gun at them, and said, "What's up now, n***?" McIntosh then shot James and Devon. Thompson and Aaron ran off with the revolver from the robbery. He and Aaron went to a house to have someone call the police. Thompson testified that he later viewed a lineup at the police station, at which he identified McIntosh. At trial, he viewed a photograph of the lineup and confirmed his identification from that day.

¶ 10　　Aaron also testified that McIntosh, whom he identified in court, arrived at the site of the robbery in a four-door gray car. Aaron testified that after he and the others took McIntosh's cash, compact discs, and cocaine, they began to leave. McIntosh followed them, asking for his keys back, and Devon threw the keys back to him. As McIntosh drove away, he yelled out the window that he was a Vice Lord and that he would kill them.

¶ 11　　Aaron testified that as the group was walking around later that morning, a red car twice passed them and "looked like they were fixin' to shoot or drive-by or something." Shortly thereafter, he saw the same gray car from earlier, again driven by McIntosh. McIntosh rolled down the driver-side window and pointed a gun. Aaron testified that McIntosh then shot Devon and James.

¶ 12　　Aaron testified that he went to the police station on January 17 to view a lineup. He testified that he was able to identify McIntosh on that day. In court, he viewed a photograph of the lineup and again identified McIntosh as the man he had picked out.

¶ 13　　The parties stipulated that a forensic scientist would testify that she examined several of the recovered compact discs and disc cases for latent fingerprints. She would testify that she identified several fingerprints suitable for comparison. Two of those prints matched those of Devon. She would testify that the other prints did not match exemplars from McIntosh.

¶ 14　　Detective David Evans of the Chicago Police Department testified that McIntosh was arrested on January 16, 2002, and that he interviewed McIntosh on that day. He testified that McIntosh denied that he was robbed and could not recall what he was doing on the day of the shooting. McIntosh also told him that he had a two-door gray Oldsmobile without tags; McIntosh never mentioned any red marks or mismatched doors. Evans testified that McIntosh told him that he had abandoned his car at some point before the day of the shooting and later found that it had been towed by the city. Evans testified that he had performed a records search

for vehicles registered to McIntosh, as well as looking for reports of a two-door, gray Oldsmobile being towed between November 17, 2001, and January 17, 2002. He testified that he was unable to locate any such vehicle. On cross-examination, Evans testified that he interviewed James on January 18 at the police station, at which time James gave a written statement.

¶ 15    The defense called Iashiskala Sims as an alibi witness. Sims testified that she was in a romantic relationship with McIntosh on the date of the shooting. She testified that she woke up with him that morning. Sims testified that she drove McIntosh to the hospital around 5 or 6 a.m. because McIntosh complained of a "pain in his penis." She estimated that they spent 1½ to 2 hours at the hospital. Sims testified that after they left the hospital, they returned to her home and that McIntosh was with her the entire day.

¶ 16    The defense's next witness was the nurse who treated McIntosh on the morning of the shooting. The nurse testified that McIntosh arrived at the hospital "complaining of penis discharge," for which he was given medication and treatment. He also testified that hospital records showed that McIntosh was triaged at 6:10 a.m. and was discharged at 7:05 a.m.

¶ 17    The court found McIntosh guilty on all counts. In allocution, McIntosh said,

> "The police officer have [*sic*] a reason to hate me. He told me he was going to get me one day. I didn't think it was going to be this bad, but I guess so. I just really want you to know after it was over that I really didn't shoot them people."

The court sentenced McIntosh to 45-years' imprisonment.

¶ 18    On direct appeal, this court vacated the conviction and sentence for aggravated battery and corrected the mittimus to reflect convictions for one count of first degree murder, one count of attempted first degree murder, and one count of aggravated discharge of a firearm. *People v. McIntosh*, 362 Ill. App. 3d 1234 (2005) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 19    McIntosh filed an amended successive postconviction petition on January 29, 2015, and a petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2016)) on June 7, 2016. In his petitions, McIntosh argued that newly discovered evidence proved that he was innocent of the crimes for which he had been convicted. Attached to his petitions were the affidavits of James, Thompson, and Aaron, each of whom recanted their trial testimony and claimed that they had falsely identified McIntosh as the shooter. The affidavits, collectively, stated that James first identified McIntosh because he was coerced by the detectives investigating the shooting and that Thompson and Aaron picked McIntosh out of their respective lineups because James told them to identify the man wearing a red shirt.

¶ 20    In his affidavit, James also swore that he learned from an unnamed fellow inmate of Cook County Jail that Devon's killer was a member of the Vice Lords known as "Eggy". McIntosh also attached laboratory reports showing that the latent fingerprints from the stolen compact discs had been run through a law enforcement database. Matches were found for Charles "Eggy" Smith (Charles) and Vernon Clay. In an affidavit, Clay swore that he was an associate of both McIntosh and Charles. He swore that, "we all used to ride around and [t]rade C.D.'s with each other and I used to sell C.D.'s." He also swore that, in 2001, Charles drove a gray, four-door Oldsmobile with "a patch on one of its doors from a wreck." Clay swore that McIntosh's car at that time was a two-door 1985 Oldsmobile. McIntosh also attached records

showing that, a bit over two months before the shooting, a gray, two-door 1985 Oldsmobile Cutlass with no tags was towed from the neighborhood where McIntosh had told the police that he had abandoned his car.

¶ 21 On October 4, 2016, the circuit court entered an order vacating McIntosh's conviction and sentences. The order noted that the relief was requested by the state's attorney and that the state's attorney had also moved to dismiss the case and forego any right to retry McIntosh for the shooting.

¶ 22 On November 8, 2016, McIntosh filed a petition for a certificate of innocence pursuant to section 2-702 of the Code of Civil Procedure (*id.* § 2-702). In support of his petition, McIntosh attached the affidavit of James to explain why James had falsely identified McIntosh. In his affidavit, James swore that he initially identified McIntosh as the shooter because of pressure from police and his mother. He maintained that he expressed doubt about McIntosh being the shooter but that the police threatened to charge him with robbery and murder if he did not cooperate. He swore, in various parts of the affidavit, that he "knew it wasn't [McIntosh]" and that he "didn't think that [McIntosh] was the one who shot [his] brother." He also swore that he had later learned from an unnamed fellow inmate of Cook County Jail that the shooter was a different member of the Vice Lords street gang.

¶ 23 In a supplemental affidavit, James swore that he "always had doubts if [McIntosh] was the [shooter]." He also swore that he was at the police station on consecutive days in January 2002. On the first day, the police showed him a photograph of McIntosh. They told him that McIntosh had been caught driving a car matching the description of the shooter's car and that he had recently "beaten a case similar" to the shooting of Devon. James then identified McIntosh in a lineup based on the photo shown to him by the police rather than his independent memory of the shooting. As he left the lineup, he saw Thompson waiting to view a lineup as well. James told Thompson to "[p]ick the guy in the read sweater." In the supplemental affidavit, James stated that he could not recall whether Aaron was with Thompson when he told Thompson how to identify McIntosh in the lineup.

¶ 24 In Thompson's affidavit, he swore that the only thing he truly recalled about the shooter was that he wore his hair in braids. Thompson swore that the police showed him a photograph of McIntosh and told him that "he was the guy that shot Devon." The police, he swore, told him that McIntosh was "known for" committing such crimes and that he had "just beat a murder." He testified that, just before he was to view a lineup, James told him, "Dude got on red, he has a red shirt on." He swore that he identified McIntosh in the lineup because of what James and the police had told him. In a supplemental affidavit, Thompson swore that he had viewed photographs of various cars and identified a "1995 four door Oldsmobile Cutlass Supreme as the car [he] remember[ed] being like the car that that shooter was driving." The car in the photograph was "just like" the shooter's car, "except for the color." He also swore that "the door or some other part of the shooter's car [was] a different color." In the record, the photograph to which Thompson refers is a black-and-white photocopy, so it is not possible to tell what color the car in the original photograph was.

¶ 25 Aaron swore, in an affidavit, that when he was brought in to view a lineup, James said, "He's got red on." Aaron swore that he knew McIntosh was not the shooter but that he picked him because James had said to and because he was scared. He also swore that he later saw a photo of Charles and believed that he "looked like the guy who shot Devon." Aaron concluded

his affidavit with the statement, "It pisses me off that [James] told me to pick [McIntosh] when he knew it wasn't him. I was a little kid, and I feel horrible about this now."

¶ 26    The petition also relied on exhibits from his postconviction filings. Additionally, McIntosh presented a laboratory report showing that Charles's fingerprint was found on one of the compact discs recovered from the robbery. McIntosh also attached records showing that Charles owned a four-door 1992 Oldsmobile Cutlass Supreme, that the car had been in a collision in June of 2001, and that the car was scrapped in January 2002.

¶ 27    Although the state's attorney did not oppose the petition for a certificate of innocence, the circuit court ordered an evidentiary hearing. At the hearing, only James testified.

¶ 28    James's testimony about the robbery was similar to his testimony at the trial, albeit with less detail. He reiterated that the shooter's car was gray, had four doors, and one of the doors was "primed up." He also testified that they had robbed their victim of cash, compact discs, and marijuana. He testified that when the police came to talk to him in January 2002, they told him that they had caught someone driving the car he had described and that person "had just beat a case." James testified that the police showed him a picture of McIntosh at that time. He testified that he told the police that he was not sure that McIntosh was the shooter, although McIntosh and the shooter both wore their hair in braids. James testified that the police "started saying [he] was going to be charged with [his] brother's murder and robbery" if he did not cooperate. He also testified that his mother pressured him to identify McIntosh as the shooter, apparently convinced that his reluctance to do so was part of a "code of silence" among gang members.

¶ 29    James testified that he went to the police station, where he was again shown photos of McIntosh and told, "this was the guy." James then viewed a live lineup, in which he identified McIntosh. He testified that as he left the lineup room, he saw Thompson. He told Thompson that he was to identify the man in the red sweater.

¶ 30    James testified that, after the trial, he and Thompson looked up McIntosh on the Department of Corrections website. He concluded that McIntosh was not the shooter because McIntosh was shorter and had longer hair than the shooter. James also testified that, while in jail on an unrelated matter, he overheard a conversation about his brother's death. The speakers, members of the Vice Lords gang, said that McIntosh was innocent and that the gunman was a different gang member called "Eggy." James testified that he reached out to McIntosh's family and agreed to sign affidavits in support of McIntosh's efforts to be exonerated. He testified that he had not been threatened, bribed, or coerced into testifying.

¶ 31    Under questioning by the court, James admitted that he had an extensive criminal background and was currently incarcerated for murder. He admitted that he had never seen a photograph of Charles. He admitted that he lied at McIntosh's trial but maintained that he did so because he felt pressured by the police and his mother. James did not know the name of the inmate who told him that Charles was the shooter.

¶ 32    James also stated that he did not tell Aaron whom to identify. But then James clarified that he did not recall whether Aaron was with Thompson at the police station when he told Thompson how to identify McIntosh. James also claimed that, before the lineup, the police told him "to pick the guy with the red sweater." Although he maintained that he expressed his doubts to the police and his mother about whether McIntosh was the shooter, he also testified that he never expressed any doubts to the court or the state's attorney.

¶ 33    Although the assistant state's attorney maintained that the State's "position in this case is not to take a position," she asked a few questions of James. She asked, "Is there anything you can tell this judge who's making a determination today that this case is not one of those phony cases that are being made up in the penitentiary?" James answered, "No, this is not one of those phony cases. Everything I'm telling you is actually what happened."

¶ 34    The circuit court entered a written order denying the petition. The court noted that there were inconsistencies in and among the affidavits of the witnesses. The court also found that the evidence related to Charles's car and fingerprints was not persuasive. In particular, the court noted that the evidence showed that Charles's car "looked like the shooter's car but was a different color." Finally, considering James's criminal background and perceived inconsistencies in his testimony, the court found that he was not a reliable witness. In sum, the circuit court concluded "that [McIntosh] has not met his burden of affirmatively demonstrating his actual innocence by a preponderance of the evidence."

¶ 35    McIntosh moved for reconsideration and moved to introduce additional records clarifying that Charles's Oldsmobile Cutlass Supreme was gray, consistent with all the eyewitness testimony. The court granted the motion to admit the documents but denied the motion for reconsideration. This appeal follows.

¶ 36                                          ANALYSIS

¶ 37    Certificate of innocence proceedings are adversarial in nature. *People v. Simon*, 2017 IL App (1st) 152173, ¶ 24. Nevertheless, and consistent with its position below, the state's attorney has elected not to file a brief in this appeal. Consequently, this court entered an order taking the case for consideration on McIntosh's brief only. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976) (reviewing courts may address the merits of a case on one party's brief only "if the record is simple and the claimed errors are such that the court can easily decide them without the aid of an appellee's brief").

¶ 38    McIntosh suggests that this court should review the circuit court's ruling for abuse of discretion. This contention is amply supported by the caselaw. See *People v. Rodriguez*, 2021 IL App (1st) 200173, ¶ 44 (collecting cases). It is our opinion, however, that the caselaw on this issue is misguided. All, or virtually all, of the cases cited by the *Rodriguez* court explicitly or implicitly rely upon federal cases interpreting a similar federal statute. See, *e.g.*, *Rudy v. People*, 2013 IL App (1st) 113449, ¶ 11 (citing *Betts v. United States*, 10 F.3d 1278, 1283 (7th Cir. 1993)). However, section 2-702 of the Code of Civil Procedure does not mirror the federal counterpart. Compare 735 ILCS 5/2-702 (West 2016), with 28 U.S.C. § 2513 (2018). Therefore, we look to section 2-702 itself to determine the appropriate standard of review. Statutory interpretation presents a question of law, which we review *de novo*. *Price v. Philip Morris, Inc.*, 2015 IL 117687, ¶ 30.

¶ 39    In *Best v. Best*, 223 Ill. 2d 342, 348 (2006), our supreme court conducted a similar analysis to determine the proper standard of review for findings of abuse under the Illinois Domestic Violence Act of 1986 (Domestic Violence Act) (750 ILCS 60/101 *et seq.* (West 2004)). The court explained that the Domestic Violence Act mandates that the trial court " 'shall issue' " an order of protection once the trial court makes a finding of abuse. (Emphasis omitted.) *Best*, 223 Ill. 2d at 348 (quoting 750 ILCS 60/214(a) (West 2004)). The court also noted that the standard of proof in such a proceeding is " 'preponderance of the evidence.' " (Emphasis omitted.) *Id.* (quoting 750 ILCS 60/205(a) (West 2004)). Taking these dictates together, the

court concluded that it would review the trial court's finding of abuse under the manifest-weight-of-the-evidence standard. *Id.* at 348-49 ("When a trial court makes a finding by a preponderance of the evidence, this court will reverse that finding only if it is against the manifest weight of the evidence.").

¶ 40    Section 2-702 presents a nearly identical set of standards to those addressed in *Best*. It provides: "If the court finds that the petitioner is entitled to a judgment, it *shall enter* a certificate of innocence finding that the petitioner was innocent of all offenses for which he or she was incarcerated." (Emphasis added.) 735 ILCS 5/2-702(h) (West 2016). "In order to obtain a certificate of innocence the petitioner must prove by a preponderance of evidence that" he meets the statutory conditions. *Id.* § 2-702(g). As was the case in *Best*, therefore, a petitioner under section 2-702 must prove a fact—or series of facts—by a preponderance of the evidence. If he does so, the court *shall* grant the petition. Because these are the same standards our supreme court considered in *Best*, we reach the same conclusion: the appropriate standard of appellate review in a certificate of innocence case is manifest weight of the evidence.

¶ 41    One last point on this issue is worth addressing. Section 2-702 provides that

> "the court, in *exercising its discretion* as permitted by law regarding the weight and admissibility of evidence submitted pursuant to this Section, shall, in the interest of justice, give due consideration to difficulties of proof caused by the passage of time, the death or unavailability of witnesses, the destruction of evidence or other factors not caused by such persons or those acting on their behalf." (Emphasis added). *Id.* § 2-702(a).

Some Illinois courts have relied on this language to determine that the abuse-of-discretion standard is appropriate when reviewing the denial of a petition for a certificate of innocence. See, *e.g.*, *People v. Pollock*, 2014 IL App (3d) 120773, ¶ 27.[2] However, our supreme court has stated that " '[a]buse of discretion' is the most deferential standard of review—next to no review at all—and is therefore traditionally reserved for decisions made by a trial judge in overseeing his or her courtroom or in maintaining the progress of a trial." *In re D.T.*, 212 Ill. 2d 347, 356 (2004). We take the language of section 2-702(a) to be a reaffirmation of the trial court's traditional discretion in overseeing the courtroom and maintaining the progress of proceedings by, among other things, determining the admissibility of evidence. See *People v. Caffey*, 205 Ill. 2d 52, 89 (2001) ("Evidentiary rulings are within the sound discretion of the trial court and will not be reversed unless the trial court has abused that discretion."). The issue here is not a discretionary decision by the circuit court, such as making an evidentiary ruling, but whether the circuit court properly weighed the evidence once it was admitted. The standard of review, therefore, is manifest weight of the evidence.

¶ 42    Under that standard, we view the evidence in the light most favorable to the appellee and, when faced with multiple reasonable inferences, will accept those inferences that support the trial court's ruling. *In re Marriage of Bates*, 212 Ill. 2d 489, 516 (2004). A determination of fact is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 70 (citing *Bazydlo v.*

---

[2]Despite coming to this conclusion, the *Pollock* court noted that "[r]easonable jurists might conclude that since this is a factual issue, we should review under a manifest weight of the evidence standard." *Pollock*, 2014 IL App (3d) 120773, ¶ 27.

*Volant*, 164 Ill. 2d 207, 215 (1995)). This deferential standard is employed "because the trial judge, as a trier of fact, is in a superior position to observe witnesses, judge their credibility, and determine the weight their testimony should receive." *Battaglia v. 736 N. Clark Corp.*, 2015 IL App (1st) 142437, ¶ 23. However, "we give less deference to a trial court's determinations of fact when they are based on evidence other than live witness testimony." *People v. Shaw*, 2015 IL App (1st) 123157, ¶ 29.

¶ 43 McIntosh contends that he met his burden to show that he was entitled to a certificate of innocence by the preponderance of the evidence. To be entitled to a certificate of innocence, it was his burden to prove that (1) he had been convicted of a one or more felonies, sentenced, and imprisoned; (2) his convictions were reversed or vacated and the indictment or information dismissed; (3) he is innocent of the charged offenses; and (4) he did not voluntarily cause or bring about the conviction. *Simon*, 2017 IL App (1st) 152173, ¶ 18 (citing 735 ILCS 5/2-702(g) (West 2012)).

¶ 44 It is beyond dispute that McIntosh was convicted of several felonies, was sentenced to a term of imprisonment, and served part of that sentence. There is no suggestion that McIntosh voluntarily caused or brought about the convictions. The only issue before the circuit court was whether McIntosh was innocent of the charged offenses. In its 12-page order denying McIntosh's petition, the circuit court exhaustively reviewed the evidence presented by McIntosh. The court "conclude[ed] that [*McIntosh*] *is unable to establish that he is actually innocent*." (Emphasis in original.)

¶ 45 In part, McIntosh argues that the circuit court applied the incorrect "actual innocence" standard it its ruling. See, *e.g.*, *Pollock*, 2014 IL App (3d) 120773, ¶ 37 (discussing the distinction " 'between a finding of not guilty at retrial and actual innocence of the charged offenses' "). Although the court used the language "actual innocence" throughout its order, we disagree that the court employed the wrong standard. In fact, the circuit court specifically noted that "actual innocence" in the context of postconviction proceedings is evaluated under a different standard than "the court's determination of actual innocence in certificate of innocence proceedings."

¶ 46 Even if "actual innocence" is a term of art that ought to be reserved for postconviction proceedings—a proposition on which we do not comment here—the circuit court clearly appreciated the distinction between the standards applied in postconviction and certificate of innocence proceedings. Rather than using the term "actual innocence" as part of applying the wrong standard, the circuit court employed that language to highlight the distinction between a finding of "not guilty" and a finding of "innocence" by preponderance of the evidence. Indeed, McIntosh's own petition argues that "he has demonstrated, by a preponderance of the evidence, that he is *actually innocent* of the crimes of which he was convicted." (Emphasis added.) In sum, we disagree that the circuit court employed the wrong standard when reviewing McIntosh's petition.

¶ 47 We turn, then, to the evidence before the circuit court. As described at length above, the evidence presented by McIntosh included the recantation of all three identity witnesses from the criminal trial, as well as evidence supporting his contention that Charles—not McIntosh—owned a car matching the description given by the eyewitnesses, a gray, four-door Oldsmobile with apparent damage to one door. Moreover, McIntosh presented evidence that the fingerprint of Charles—again, not McIntosh—was found on compact discs stolen from the shooter. McIntosh was also pointed to the trial testimony of Sims who testified that she was with him

that entire day and whose testimony was corroborated by the emergency room nurse who treated McIntosh that morning.

¶ 48 We agree with McIntosh that the evidence was sufficient to establish his innocence by a preponderance of the evidence. We are mindful of the fact that we owe considerable deference to the circuit court's conclusion, but the evidence of McIntosh's innocence was so one-sided that the "opposite conclusion is apparent." See *Lawlor*, 2012 IL 112530, ¶ 70.

¶ 49 The circuit court found that James was not a credible witness, based on his criminal background and his live testimony.[3] We must credit the circuit court's ruling on that point because the court was in a better position to weigh James's credibility. See *Shaw*, 2015 IL App (1st) 123157, ¶ 26. However, the rest of the evidence before the circuit court was a "cold record," and the circuit court was in no better position to weigh that evidence than we are. See *id.* ¶ 29.

¶ 50 Although the State did not present any evidence at the hearing on McIntosh's petition, the circuit court was entitled to take judicial notice of inculpatory evidence from the trial. See 735 ILCS 5/2-702(f) (West 2016) ("the court may take judicial notice of prior sworn testimony or evidence admitted in the criminal proceedings"). The court did not explicitly take judicial notice of the trial record, but it did outline the trial evidence in its order denying the petition.

¶ 51 The evidence that McIntosh *was* the shooter consisted of the trial testimony of James, Thompson, and Aaron, together with the testimony of Evans, in which Evans testified that McIntosh told him that he had abandoned a gray, two-door Oldsmobile sometime before the shooting. Even allowing for the circuit court's credibility assessment of James, all the State's trial evidence has been thoroughly debunked.

¶ 52 Thompson and Aaron both recanted their trial testimony identifying McIntosh as the shooter. They corroborated each other on how they, as scared 12-year-olds, first identified McIntosh as the shooter because James told them to pick the man in the red shirt. The circuit court did not believe this portion of Thompson and Aaron's testimony because James testified that he did not tell Aaron to identify the man in red and because the police reports indicate that James viewed his lineup after Thompson and Aaron viewed theirs. Neither of these supposed contradictions are borne out by the record.

¶ 53 As to James's testimony that he did not tell Aaron to pick the man in red, the testimony was more nuanced than the court portrayed it. Although James answered "no" when asked if he told Aaron to pick the man in the red shirt, he testified that he *did* tell Thompson and that he could not recall whether Aaron was there as well. In Aaron's affidavit, he swore that he was

---

[3]We agree that James's credibility is suspect for several reasons. The factual premise of the shooting, which has not changed since the earliest reports, is that Devon and James lured the shooter into their presence by falsely intimating that they were selling a then-illegal drug. Then, they robbed him at gunpoint. The evidence also suggested that the then-12-year-old Thompson and Aaron were brought along for the robbery for strategic reasons related to the perceived innocence of children. Finally, recanting trial testimony necessarily establishes that a witness is, at least under some circumstances, willing to lie under oath. In sum, there is every reason to believe that James lied under oath at least once. Still, it appears at least as likely that he lied during the criminal trial as during the certificate of innocence hearing. His stated motive for lying in the first place was because of the threat of prosecution. If he lied in his affidavits and at the certificate of innocence hearing, it is unclear what motive he could have for seeking the vindication of the man who shot him and killed his brother.

with Thompson at the time and that Thompson "said the same stuff and told [him] what [James] said." There is, consequently, no meaningful contradiction among the witnesses on this point.

¶ 54　　As to the timing of the lineups, McIntosh presents a detailed argument that the January 18 lineup that James allegedly viewed was for a separate criminal investigation entirely. The brief alleges that the official timeline could not possibly be accurate because one of the men in the January 18 lineup with McIntosh was not arrested until after the lineup allegedly took place. In fact, McIntosh argues, James must have viewed a lineup on January 17, the same day as Thompson and Aaron. This argument was properly before the circuit court, as it formed a substantial part of McIntosh's section 2-1401 petition, which he incorporated into his petition for a certificate of innocence. The State's decision not to contest the petition or this appeal leaves all the evidence and argument on this point unrebutted. Taking as true, therefore that James's lineup was viewed on the same day as Thompson and Aaron viewed theirs, there is no inconsistency in the witnesses' claim that James had the opportunity to view the lineup, identify McIntosh, and then tell Thompson and Aaron to identify the man in the red shirt.

¶ 55　　All the witnesses also corroborated each other on their description of the shooter's car. This is important because the impound records established (1) that McIntosh told Evans the truth when he said that his car was towed before the shooting and (2) that his two-door Oldsmobile did not match the eyewitness descriptions of the shooter's car. Taken with McIntosh's alibi evidence, the record shows convincingly that McIntosh was not the shooter.

¶ 56　　Moreover, McIntosh presented a credible alternative suspect. Charles's fingerprint was found on one of the stolen compact discs. McIntosh also presented records that Charles owned a gray four-door 1992 Oldsmobile Cutlass Supreme, that the car had been in a collision in June 2001, and that the car was scrapped in January 2002. This vehicle matches the eyewitness descriptions, down to the apparent collision damage. It is also consistent with the affidavit of Clay, who swore that Charles drove a gray, four-door Oldsmobile with "a patch on one of its doors from a wreck." Charles's identity as a member of the Vice Lords gang also matches the eyewitness testimony that the shooter shouted about his gang affiliation just after the robbery.

¶ 57　　The circuit court discounted the evidence related to Charles because "there can be many explanations" for the presence of his fingerprint on one of the stolen compact discs. The court also stated that the evidence showed that Charles's car "looked like the shooter's car but was a different color." Neither of these points, however, are to McIntosh's detriment.

¶ 58　　As to the color of the car, the record does not support the court's conclusion. The court apparently based this conclusion on Thompson's supplemental affidavit, in which he explained that he viewed a photograph of a 1995 four-door Oldsmobile Cutlass Supreme and swore that the car in the photograph was "just like" the shooter's car, "except for the color." In the record, the photograph attached to the affidavit is a low-resolution, black-and-white photocopy, so it is difficult to determine the color of the car. Moreover, Thompson's affidavit does not say what color either the shooter's car or the photographed car were. However, in the section 2-1401 petition, McIntosh makes it clear that the photograph identified by Thompson was of a white car. Consequently, there is nothing inconsistent about Thompson's claim that the (white) car in the photograph was identical to the (gray) shooter's car "except for the color."

¶ 59　　At the criminal trial, Thompson testified, consistent with all the other eyewitnesses, that the shooter's car had four doors and was gray. Although Aaron testified at trial and in his affidavit that he saw a red car on the morning of the shooting, he testified in both instances that

- 11 -

the shooter drove a gray, four-door car. In sum, the records related to Charles's car are completely consistent with all the eyewitness accounts of the shooter's car.

¶ 60 As to the fingerprint, the circuit court was correct that there are explanations other than Charles's guilt. For example, Clay swore in his affidavit that he, McIntosh, and Charles "all used to ride around and [t]rade C.D.'s with each other." Charles's fingerprint on one of the stolen compact discs, therefore, is not especially probative of the shooter's identity as between McIntosh and Charles. Indeed, Clay's fingerprint was also on one of the discs, and there is no suggestion that he was the shooter.

¶ 61 However, McIntosh correctly points out that James's jailhouse information came *before* Charles's fingerprint was identified. This is not a case where the fingerprint led to a new suspect, but where the suspicion led to the discovery of the fingerprint. If Charles was not the gunman, it is a remarkable coincidence that he was wrongly implicated *first* and only *later* tied to the crime scene by physical evidence. The possibility of such a coincidence may well amount to reasonable doubt about Charles's guilt, but it certainly does not weigh against McIntosh's claim of innocence.

¶ 62 The recantations of all three identifying witnesses, McIntosh's alibi evidence, and evidence that McIntosh's car neither matched the description of the shooter's car, nor was even in his possession at the time of the shooting, leave no evidence that McIntosh was the gunman. The evidence pointing to Charles as the true culprit lends significant weight to McIntosh's claim of innocence. Taking all the evidence together, we find that McIntosh clearly met his evidentiary burden and that the circuit court's conclusion to the contrary was against the manifest weight of the evidence.

¶ 63 It is worth noting that the issue before us is unlike, for example, the denial of a postconviction petition after a third-stage evidentiary hearing. A representative example of such a case is *People v. Morgan*, 212 Ill. 2d 148, 151 (2004), in which our supreme court affirmed the dismissal of postconviction petition after an evidentiary hearing. In so doing, the *Morgan* court noted that "[t]he recantation of testimony is regarded as inherently unreliable." *Id.* at 155. The court affirmed the denial of the petition based, in part, on the trial court's determination that the recanting witness was not credible. *Id.* at 165. However, that was not the only support that the court found for denying the petition. The court also noted that there were other identification witnesses who had not recanted (*id.* at 163, 165) and found that physical evidence introduced at trial was consistent with the defendant's guilt (*id.* at 160-61). Perhaps most importantly, in *Morgan*, as in most criminal appeals, the State participated and argued against the defendant's claims. *E.g.*, *id.* at 155 (agreeing with the State's argument that defendant's "evidence was not of such conclusive character that it would probably change the result on retrial").

¶ 64 In this case there remains no independent evidence tying McIntosh to the crime. Moreover, although recantation testimony is inherently unreliable, this case involves three witnesses whose recantations are mutually corroborating as to how and why they offered false testimony in the first place. Tellingly, the State made no arguments against McIntosh's claim. Indeed, despite the adversarial nature of certificate of innocence proceedings (*Simon*, 2017 IL App (1st) 152173, ¶ 24), the State's only substantive action during the evidentiary hearing was to elicit testimony *in favor* of McIntosh's claim. The assistant state's attorney specifically asked James, "Is there anything you can tell this judge who's making a determination today that this case is not one of those phony cases that are being made up in the penitentiary?" James

answered, "No, this is not one of those phony cases. Everything I'm telling you is actually what happened."

¶ 65 The evidence presented by McIntosh was self-consistent and refuted every single aspect of the State's trial theory. The State's silence, or near silence, during the petition for certificate of innocence proceedings left all of McIntosh's arguments unchallenged and unrebutted. Indeed, these proceedings had their genesis when the State, under the direction of State's Attorney Alvarez, requested that the court vacate McIntosh's convictions after he had already served over a decade in prison. That concession places this case on a markedly different footing than that in an ordinary postconviction appeal.

¶ 66 CONCLUSION

¶ 67 Accordingly, we reverse the ruling of the circuit court and remand this case with instructions for the circuit court to enter a certificate of innocence.

¶ 68 Reversed and remanded.