2023 IL App (1st) 200492-U

No. 1-20-0492

Third Division
September 20, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| | ) | Nos.   03 CR 8607(01) |
| v. | ) | 03 CR 8607(02) |
| | ) | |
| JOHN FULTON and ANTHONY MITCHELL, | ) ) | The Honorable LeRoy K. Martin, Jr., |
| Defendants-Appellants. | ) ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE REYES delivered the judgment of the court.
Justices D.B. Walker and R. Van Tine concurred in the judgment.

**ORDER**

¶ 1    *Held:*  The circuit court's denial of defendants' petitions for certificates of innocence is reversed, where the circuit court's findings as to the voluntariness of defendants' confessions is unclear from its decision.

¶ 2    In 2006, after simultaneous jury trials, defendants John Fulton (Fulton) and Anthony Mitchell (Mitchell) were convicted of first-degree murder, aggravated kidnapping, and concealment of the homicidal death of victim Cristopher Collazo (Collazo). Both defendants received identical sentences of 31 years for the murder, 25 years for the aggravated kidnapping, and 3 years for the concealment of homicidal death, with the sentences to be served

concurrently. The convictions were affirmed on direct appeal, but were remanded for resentencing, where defendants received consecutive sentences of 25 years for the murder, 6 years for the aggravated kidnapping, and 2 years for the concealment of homicidal death.

¶ 3      Both defendants separately filed postconviction petitions pursuant to the Post-Conviction Hearing Act, and, in 2019, the circuit court granted both petitions and vacated defendants' convictions. The State ultimately nol-prossed the charges instead of retrying the cases.

¶ 4      In June 2019, each defendant filed a petition for a certificate of innocence pursuant to section 2-702 of the Code of Civil Procedure (Code) (735 ILCS 5/2-702 (West 2018)), claiming that they were actually innocent of the crimes for which they had been convicted. The circuit court denied the petitions, finding that neither defendant had established his actual innocence by a preponderance of the evidence. Defendants now appeal and, for the reasons that follow, we reverse the circuit court's denial and remand for further proceedings.

¶ 5                                    BACKGROUND

¶ 6      In the early morning hours of March 10, 2003, a witness discovered the body of Collazo lying in an alley on the south side of Chicago; he had been bound, gagged, beaten, and set on fire. After an investigation by police, defendants Fulton and Mitchell, along with codefendant Antonio Shaw,[1] were indicted on multiple counts of first-degree murder, aggravated kidnapping, and concealment of a homicidal death.

¶ 7                                    *Trials*

¶ 8      Fulton and Mitchell were tried simultaneously, but before separate juries. At trial, the State's theory was that Mitchell was Fulton's accomplice in the murder of Collazo, which

---

[1] Charges against Shaw were dismissed prior to trial, after his motion to suppress statements he made to police was granted.

2

occurred as revenge for an incident in which Collazo had robbed Fulton. Fulton presented an alibi theory of defense, claiming that he was at home with his girlfriend at the time of the murder; Mitchell also relied on Fulton's alibi as his defense. Although the State introduced evidence that both defendants had confessed to the murder, both Fulton and Mitchell contended that those confessions were false.

¶ 9     As relevant to the instant appeal, the evidence at trial established the following.[2] In February 2003, approximately a month prior to Collazo's death, Fulton and Collazo were involved in a deal to purchase a firearm which had been arranged with the help of a mutual friend named Johnitta Griffin, known as "Precious." Fulton had contacted Precious, informing her that he was interested in purchasing a firearm and asking whether she knew anyone who would sell him one. Precious connected Fulton with Collazo, and the three engaged in a three-way call about the purchase. Fulton and Collazo agreed to meet at a location on Diversey Avenue to make the transaction.

¶ 10     Unbeknownst to Fulton, Collazo and his friend, Marcus Marinelli, developed a plan to rob Fulton when he arrived to purchase the firearm. When Fulton arrived, Collazo escorted him inside the building, where Marinelli pointed a handgun at him and demanded money. Fulton handed Marinelli a wad of bills, which Marinelli presumed to be $300—the asking price for the firearm—but which ultimately turned out to be only $14. After robbing Fulton, Collazo and Marinelli ran away to a friend's home.

---

[2] As both defendants challenged their convictions on direct appeal, we relate the evidence at trial largely as set forth in our prior decisions. Since the evidence presented at trial is relevant to the determination of whether defendants are entitled to certificates of innocence, we relate it in considerable depth.

¶ 11        Shortly after the robbery, Mitchell—pretending to be Fulton's brother—called Precious, telling her that Collazo had robbed Fulton and demanding his money back. Precious also received multiple telephone calls from Collazo, bragging about the robbery. On March 7, 2003, a few days before Collazo was killed, Fulton called Precious and demanded his money back, threatening to hurt Collazo if she did not return his money.

¶ 12        On March 9, 2003, Collazo called Precious at approximately 3 p.m. to inform her that he was planning on visiting Marisol Caldero, Precious' godmother, that evening. Precious informed Collazo that she would be at Caldero's home, but not until later that evening. According to Precious' grand jury testimony, which she later recanted at trial, at approximately 4 p.m., Fulton called Precious again asking about the money, and Precious informed Fulton about Collazo's plan to visit Caldero that evening. Precious provided several details about Collazo and his plans, including where he was going, which bus he was likely to take, what he would be wearing, and his physical description. Precious arrived at Caldero's home at approximately 10:30 p.m. and was told that Collazo had called 15 to 20 minutes earlier to find out if Precious had arrived. Precious waited for Collazo, but he never called back and never arrived.

¶ 13        At approximately 3 a.m. on March 10, 2003, a man named Sid Taylor called 911 after looking out his window into the alley behind his apartment on the south side of Chicago and observing a fire burning. Collazo's burned body was discovered lying on a partially charred cardboard box. He was bound and gagged and covered in a plastic material; his hands were behind his back, and his hands and legs were wrapped together. Taylor informed police that he had observed two African-American males standing near the fire, one wearing a red jacket and the other wearing a black jacket. An autopsy revealed that Collazo's body had been beaten

prior to his death, and the medical examiner opined that the cause of death was multiple blunt force trauma injuries, with a significant contributing factor being asphyxiation due to the gag in his mouth; Collazo was deceased before his body was set on fire.

¶ 14    Investigators spoke with Collazo's family, who identified Marinelli as one of Collazo's last contacts before his death. Marinelli informed them about Collazo's plans to visit Caldero, as well as the robbery of Fulton. Investigators also spoke with Precious, who confirmed the details of the robbery but became "evasive" when asked whether she had contact with Fulton on the evening of March 9 or early morning of March 10. Precious was later taken to the police station for questioning, where she was interviewed by an assistant State's attorney (ASA) and informed him that she had spoken with Fulton on the evening of March 9 and had provided him with Collazo's whereabouts; she later testified consistently with her statement before a grand jury.

¶ 15    On March 18, 2003, detectives arrested Fulton at his home and brought him to Area One headquarters for questioning. Fulton's vehicle was also searched, and fingerprints of codefendant Shaw were found underneath the spare tire cover in the trunk. During an initial conversation with detectives, Fulton identified photos of Collazo, Marinelli, and Precious and indicated that they were involved in robbing him when he attempted to purchase a gun; Fulton was not questioned about the murder at that time.

¶ 16    During a second conversation, Fulton denied involvement in Collazo's death. Fulton was brought to the polygraph unit for a polygraph examination, but before the examination, Fulton made an inculpatory statement to the detective conducting the examination, telling the detective that he spoke with Precious on March 8, where she told him that Collazo would be attending a party on March 9. Fulton spoke with Mitchell and Shaw and decided to beat Collazo

up. Following Precious' directions, the three drove to the north side of Chicago in Fulton's vehicle and observed Collazo exit the bus. They then beat Collazo and placed him in Fulton's trunk. After driving for some time, they pulled over, removed Collazo from the trunk, bound him with duct tape, and placed a plastic bag over his head before returning him to the trunk. They continued driving until they reached the south side of Chicago, where they found a refrigerator box in an alley and placed Collazo inside. Fulton then poured gasoline on the box from a gas can Fulton kept inside his vehicle, then lit the box on fire. After the conversation with the detective conducting the polygraph examination, the detectives investigating the matter decided a polygraph was not necessary and instead drove Fulton to view the various crime scenes, returning to Area One headquarters at approximately 2 a.m.

¶ 17    After returning, Fulton spoke to ASA McRay Judge and gave him a statement which was consistent with his previous statements. At the end of the conversation, ASA Judge spoke to Fulton outside the presence of detectives, where Fulton leaned over and said, in a low voice, "what if I were to tell you that everything I just told you I made up." ASA Judge asked if Fulton was telling him what happened or merely suggesting a hypothetical, and Fulton responded, "No, that's what happened." ASA Judge asked why Fulton would make up such a story, and Fulton responded that he wanted to "shut the detectives up," but that he was not intimidated by, or fearful of, the detectives. Fulton then informed ASA Judge that he had been with his girlfriend on the evening in question, that she had been ill, and that he had taken her to the hospital.

¶ 18    ASA Judge reminded Fulton that he had previously indicated that he, Mitchell, and Shaw had been wearing a white hoodie, a red hoodie, and a black hoodie at the time. Fulton explained that he had made that information up, as he knew that either Mitchell or Shaw owned a black

hoodie, and Fulton owned both a white hoodie and a red hoodie, so he could say that he allowed his friend to borrow a hoodie. ASA Judge asked Fulton what his response would be if he knew that a witness observed two offenders standing next to Collazo's body, one wearing a red top and one wearing a black top. Fulton responded, "that wouldn't be very good for me, would it?" Fulton, however, maintained that he had fabricated the story. ASA Judge believed that Fulton was lying, but nevertheless informed detectives of Fulton's alibi.

¶ 19 The next day, on March 19, 2003, Fulton spoke with ASA Jake Rubenstein, where he informed ASA Rubenstein of the earlier robbery and again indicated that he had been with his girlfriend on the evening of the murder. Fulton told ASA Rubenstein that they had been at the hospital until 3 a.m., when they went home and went to sleep. ASA Rubenstein asked Fulton about his previous conversation with ASA Judge, and Fulton stated that his confession was a lie. ASA Rubenstein asked how Fulton would know the details of what to say, and Fulton responded that he had overheard the detectives talking about the case.

¶ 20 Later that evening, Mitchell was arrested. Upon arrest, Mitchell denied involvement in the murder, but said he could not recall his precise whereabouts on the evening of March 9 and speculated that he may have been at a cousin's house.

¶ 21 On March 20, 2003, ASA Rubenstein spoke to the detectives investigating the matter, and they visited the scene where Collazo's body had been discovered, as well as the hospital where Fulton's girlfriend had allegedly been treated. ASA Rubenstein spoke with both defendants again, but neither provided any new information.

¶ 22 On March 21, 2003, while he was at Area One headquarters concerning a different case, ASA Rubenstein again spoke with Fulton, who indicated that his previous alibi was a lie and

again confessed to the murder. ASA Rubenstein asked Fulton why he had changed his story, and Fulton said that he feared Mitchell and Shaw would attempt to blame him for the murder.

¶ 23    Also on March 21, 2003, Mitchell confessed to the murder; his confession was recorded on video, and was largely consistent with the statements made by Fulton.

¶ 24    At trial, both defendants' defense was primarily centered on Fulton's alibi, as well as casting doubt as to the plausibility of the State's theory. For instance, an employee of the Chicago Transit Authority testified that, according to the bus schedule, the last Foster Avenue bus (the bus route that Collazo was alleged to have taken) would have arrived at 8:21 p.m. on the evening of the murder. A Comcast employee also testified that a pay-per-view movie was ordered on Fulton's television at 11 p.m. on March 9, 2003. Yolanda Henderson, Fulton's girlfriend, also testified that Fulton had taken her to the hospital on March 9, 2003, after which they returned home for the night, and identified photos and videos showing (1) Fulton and Henderson leaving their apartment building at 8:09 p.m. on March 9; (2) them arriving at the hospital at 8:33 p.m.; (3) Fulton entering the apartment building at 10:57 p.m. and exiting at 11:30 p.m.; (4) Fulton and Henderson returning to the apartment building at 11:53 p.m.; and (5) them leaving the apartment building the following morning at 7:56 a.m. Telephone records also did not show any phone calls between Fulton and Precious on March 9, 2003.

¶ 25    In response to Fulton's alibi evidence, the State claimed that Fulton could have left his apartment building through the back door. Accordingly, in rebuttal, the State called an investigator to testify that there were no security cameras in the back area of Fulton's apartment building. The investigator also identified several photos of the rear of the apartment building, in which no cameras were visible.

¶ 26    Following closing arguments, both juries found defendants guilty. Fulton and Mitchell were each sentenced to 31 years for first-degree murder, 25 years for aggravated kidnapping, and 3 years for concealment of a homicidal death, with the sentences to run concurrently.

¶ 27    *Direct Appeals*

¶ 28    Both defendants filed appeals of their convictions. In his appeal, Mitchell contested (1) whether there was sufficient evidence of his guilt, (2) whether the trial court erred in denying his motions to quash arrest and to suppress statements, and (3) whether the closing argument of the prosecution was improper. *People v. Mitchell*, No. 1-06-3359 (2010) (unpublished order under Illinois Supreme Court Rule 23). Mitchell's conviction was affirmed, but the case was remanded to the circuit court for resentencing. *Id.*

¶ 29    In his appeal, Fulton contested (1) whether the police had probable cause to arrest him, (2) whether his motion to suppress statements was properly denied, (3) whether the evidence was sufficient to prove him guilty beyond a reasonable doubt, and (4) whether the prosecution made improper comments during closing argument. *People v. Fulton*, No. 1-07-0058 (2010) (unpublished order under Illinois Supreme Court Rule 23). As with Mitchell, Fulton's conviction was affirmed but the case was remanded for resentencing. *Id.*

¶ 30    *Postconviction Proceedings*

¶ 31    In 2013, Mitchell filed a postconviction petition,[3] in which he alleged (1) that the State had violated its obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose exculpatory evidence to the defense, (2) that Mitchell's trial counsel had been ineffective, and (3) that newly discovered evidence established his actual innocence. Specifically, Mitchell alleged

_____

[3] While it is undisputed that Fulton filed a similar postconviction petition, Fulton's petition is not contained in the record on appeal.

that, at trial, the State argued that Fulton had been able to leave his apartment building via the back door in order to evade all surveillance. New evidence, however, established that there were multiple surveillance cameras at Fulton's apartment building, including one at the back door—a fact which the State never disclosed at trial. Mitchell further alleged that the police officers who interrogated Fulton and Mitchell had a "pattern and practice of coercing and falsifying confessions from innocent people" using the same tactics used on them, but this information was never disclosed to Mitchell. Finally, Mitchell alleged that his trial counsel was ineffective for failing to properly investigate the apartment building's surveillance system, for failing to question prospective jurors about their feelings about false confessions, and for failing to investigate the "brutal and unique method of killing," which was affiliated with a particular street gang to which Fulton did not belong. In the alternative, if counsel was not ineffective for failing to properly investigate the building's surveillance system, Mitchell alleged that the evidence as to the surveillance cameras constituted newly discovered evidence which supported an actual innocence claim.

¶ 32     In response, the State agreed that an evidentiary hearing was warranted on Mitchell's *Brady* claim, his ineffective assistance of counsel claim, and his actual innocence claim to the extent that such claims relied on the presence or absence of surveillance cameras focused on the rear lobby exit of the apartment building. With respect to Mitchell's remaining claims, however, the State requested that such claims be dismissed as there were insufficient legal or factual bases to support them.

¶ 33     The circuit court conducted an evidentiary hearing on the issues concerning the presence of surveillance cameras in 2018. At the hearing, Tamala Boyette, a former property manager for the apartment building, testified that there were three security cameras installed in the lobby

of the building, which had been installed in the 1990s and updated in 2002; the cameras were located "[i]n the back facing the mailbox," in front of the elevator, and in the building entryway, and their purpose was to record traffic entering and exiting the building. Boyette testified that, while residents could enter or exit the building through the back door, they would still be required to pass through the lobby and would be in view of the cameras. Other witnesses called by the defense testified to a letter sent to building residents in August 2002 which indicated that cameras would be installed in the lobby area.

¶ 34 Michael Sanfratello, the principal of a security installation company, testified on behalf of the State that his company entered into a contract to install security systems in the apartment building in 2002, but that the contract did not include the installation of a surveillance camera near the back door. Instead, the company installed a key fob system on the back door, which required wiring to run from a junction box located near the door. On cross-examination, Sanfratello testified that a resident returning through the back door would be required to use a fob to enter the building, which would capture the identity of the fob holder. Sanfratello further testified that a camera could later be affixed to the junction box, and that his company was not the exclusive provider of cameras for the building; Sanfratello, however, testified that his company was still working on the installation in July 2003 and there was no camera installed at that time.

¶ 35 After the hearing, defendants supplemented their postconviction petitions to add allegations concerning evidence of the key fob and reader installed on the back door.

¶ 36 In February 2019, the circuit court granted defendants' postconviction petitions, vacating their convictions and ordering new trials. The circuit court found that the jury did not receive evidence as to whether there was a functioning camera at the rear entrance of Fulton's

apartment building, nor did it hear about the key fob reader at the back door. The court observed that there was no physical evidence connecting either defendant to the crime, with the only "real evidence" being "the inconsistent statement of an 18-year-old John Fulton taken *** during a period of four days and was unrecorded." Thus, the court found that "whether you want to title [the] lack of disclosure as a Brady violation or ineffective assistance of counsel, the end result is the same as far as [defendants] are concerned." The court determined that this evidence should have been presented to the jury and its absence prejudiced defendants and deprived them of a fair trial.

¶ 37    In May 2019, the State nol-prossed all charges against both defendants, stating that due to the age of the case and the status of the witnesses, it would be unable to satisfy its burden of proof on retrial.

¶ 38                                        *Certificate of Innocence Proceedings*

¶ 39    In June 2019, Fulton and Mitchell each filed nearly-identical petitions for certificates of innocence pursuant to section 2-702 of the Code, in which each defendant alleged that he was actually innocent of the crimes for which he was convicted.

¶ 40    The State filed objections to both petitions, claiming that defendants failed to prove that (1) they were innocent of the offenses charged and (2) they did not contribute to their own convictions.

¶ 41    After hearing arguments from both parties, the circuit court ultimately denied the petitions. The court found the State's arguments that defendants had brought about their own convictions to be unpersuasive, noting that "a fair argument can be made that they have, but I don't believe they have." Thus, the court found that the main focus was whether defendants had proved by a preponderance of the evidence that they were actually innocent. While the circuit court

observed that defendants had raised "compelling arguments," it ultimately found that defendants were unable to satisfy the requirement of actual innocence. The court based its determination in large part on its finding that Mitchell "gave a credible statement" when he confessed. The court found that, "while we can argue about some of the details of that statement, it appears to me, through his demeanor; his coolness; *** the way he *** spoke and the way he was able to fill in certain details, it convinced me of the truthfulness of at least what I consider to be very important parts of that statement." The court further stated that it had considered the statements of Precious, and her conversations with both defendants, noting that "we could debate some of the details, and I've debated and considered all of those things, over and over and over again." The court observed that the burden remained on defendants to establish their innocence and found that, considering Mitchell's statement, Precious' statements, and the prior altercation between Fulton and Collazo, "I just remain unconvinced that [defendants] are able to sustain their burden."

¶ 42    This appeal follows.

¶ 43                                ANALYSIS

¶ 44    On appeal, the sole issue is whether the circuit court erred in denying defendants' petitions for certificates of innocence. As an initial matter, the State asks us to strike the "Nature of the Case" and "Statement of Facts" sections of defendants' appellate brief, claiming that they are argumentative and contain unsupported factual assertions in violation of Supreme Court Rule 341(h). Ill. S. Ct. R. 341(h) (eff. Oct. 1, 2020). The Illinois Supreme Court Rules have the force of law (*Grant v. Rancour*, 2020 IL App (2d) 190802, ¶ 16 n.1), and we may strike a brief in violation of the rules (*Carter v. Carter*, 2012 IL App (1st) 110855, ¶ 12). While we agree with the State that these sections are argumentative and lack appropriate citations to the record,

these violations do not hinder or preclude our review, and we therefore decline to strike defendants' brief either in whole or in part. See *id*. We turn, then, to consideration of defendants' arguments on appeal.

¶ 45     Both defendants sought certificates of innocence pursuant to section 702 of the Code, which provides that a petitioner may obtain a certificate of innocence if he proves, by a preponderance of the evidence, that (1) he was convicted of one or more felonies, sentenced to prison, and served all or part of the sentence; (2) the judgment of conviction was reversed or vacated and he was subsequently found not guilty at a new trial or the charges were dismissed; (3) he is innocent of the charged offenses; and (4) he did not voluntarily cause or bring about his conviction through his own conduct. 735 ILCS 5/2-702(g) (West 2018); *People v. Washington*, 2023 IL 127952, ¶ 50; *People v. McIntosh*, 2021 IL App (1st) 171708, ¶ 43. Here, three of the four elements are not in dispute; while the State argued below that defendants had brought about their own convictions through their confessions, it does not make this argument on appeal. Thus, the sole question is whether each defendant established, by a preponderance of the evidence, that he "is innocent of the offenses charged." 735 ILCS 5/2-702(g)(3) (West 2018).

¶ 46     There is a split of authority as to the standard of review to be applied to certificate of innocence determinations. Compare *People v. Rodriguez*, 2021 IL App (1st) 200173, ¶ 44 (applying abuse of discretion standard of review), with *McIntosh*, 2021 IL App (1st) 171708, ¶ 40 (applying manifest weight of the evidence standard of review). See also *Washington*, 2023 IL 127952, ¶ 47 (noting split in authority but declining to resolve it). In this case, however, we reach the same conclusion regardless of the standard applied.

¶ 47    In denying defendants' petitions below, the circuit court found that, while defendants had raised "compelling arguments," they were nevertheless unable to establish that they were actually innocent of the charged offenses. As noted, the court based its determination in large part on its finding that Mitchell "gave a credible statement" when he confessed, finding that, "while we can argue about some of the details of that statement, it appears to me, through his demeanor; his coolness; *** the way he *** spoke and the way he was able to fill in certain details, it convinced me of the truthfulness of at least what I consider to be very important parts of that statement." Defendants contend that the circuit court's reliance on Mitchell's statement was inappropriate, as Mitchell's statement was "involuntary" and therefore presumptively unreliable, while the State maintains that Mitchell's statement was properly considered as it was voluntary.

¶ 48    The difference in the parties' positions can be traced to the circuit court's finding as to the fourth required element for a certificate of innocence, namely, the requirement that the petitioner did not "voluntarily cause or bring about" his conviction through his own conduct. See 735 ILCS 5/2-702(g) (West 2018). Below, the State contended that defendants had failed to establish this element, as they confessed to killing Collazo. Defendants, in response, maintained that their confessions were false. In ruling on the petitions, the circuit court found the State's arguments that defendants had brought about their own convictions to be unpersuasive, noting that "a fair argument can be made that they have, but I don't believe they have." As the primary evidence against defendants was their confessions, this finding implicitly cast doubt upon the voluntariness of those confessions. See, *e.g.*, *Washington*, 2023 IL 127952, ¶ 59 (finding that the defendant did not voluntarily bring about his own conviction where the defendant's confession was due to the abusive and coercive conduct of police). The

court, however, nevertheless relied on Mitchell's confession in finding that defendants had not established their innocence, suggesting that it found the confession worthy of belief.

¶ 49   As noted, certificate of innocence proceedings are reviewed under a deferential standard of review, either for an abuse of discretion or under a manifest weight of the evidence standard. See *Rodriguez*, 2021 IL App (1st) 200173, ¶ 47 (a circuit court abuses its discretion "only when its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by" the court); *McIntosh*, 2021 IL App (1st) 171708, ¶ 42 (a finding of fact is against the manifest weight of the evidence "only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence"). In this case, the circuit court clearly gave careful consideration to the parties' arguments and the trial record, noting that it had "read, reread, pondered and mulled over all the exhibits, transcripts, videos and pleadings" prior to its ruling and even rescheduling its ruling date when it found the matter required further contemplation. Despite the circuit court's efforts, however, we nevertheless must find that we are unable to properly review the circuit court's decision, as its conclusion as to defendants' confessions—especially Mitchell's confession, which was expressly relied upon in its decision—is unclear. Accordingly, while we recognize that these proceedings have been ongoing for some time, we nevertheless find that the cause must be remanded to the circuit court, so that the basis for any decision on defendants' petitions is clearly set forth in its ruling.

¶ 50                                          CONCLUSION

¶ 51        For the reasons set forth above, we reverse the circuit court's denial of defendants' petitions

for certificates of innocence and remand the cause to the circuit court for further proceedings

consistent with our decision.

¶ 52        Reversed and remanded.