2022 IL App (2d) 210558
No. 2-21-0558
Opinion filed December 28, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 93-CF-1174 |
| PATRICK ANTHONY PURSLEY, | ) ) | |
| Defendant-Appellee | ) ) | |
| (Sam Pobjecky, John Genens, Mark Schmidt, Ron Gallardo, Jeff Houde, Greg Hanson, Jim Bowman, Bruce Scott, Stephen Pirages, Estate of Howard Forrester, Estate of Gary Reffett, and Estate of David Ekedahl, Third-Party Intervenors-Appellants). | ) ) ) ) ) ) ) | Honorable Joseph G. McGraw, Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Jorgensen and Brennan[1] concurred in the judgment and opinion.

**OPINION**

_____

[1]Justice Brennan participated in this appeal, but has since been elected to the Third District Appellate Court. Our supreme court has held that the departure of a judge prior to the filing date will not affect the validity of a decision so long as the remaining two judges concur. *Proctor v. Upjohn Co.*, 175 Ill. 2d 394, 396 (1997).

¶ 1    The State appeals the trial court's order granting Patrick Pursley's petition for a certificate of innocence under section 2-702 of the Code of Civil Procedure (Code) (735 ILCS 5/2-702 (West 2018)). The State argues that Pursley did not prove his innocence by a preponderance of the evidence. We affirm.

¶ 2                                I. BACKGROUND

¶ 3                         A. Pursley's Conviction and Direct Appeal

¶ 4    The following facts are adduced largely from this court's opinion issued in Pursley's direct appeal. *People v. Pursley*, 284 Ill. App. 3d 597 (1996). On April 2, 1993, at about 10 p.m., Andrew Asher and his girlfriend, Becky George, were seated in a parked car in a residential area in Rockford. A man approached the car, pulled the driver's door open, and pointed a gun at Asher and George. The assailant said it was a "stick-up" and demanded money. George put her hand out with some money she had taken out of her purse. While holding out her hand with the money and looking down in her purse for more, she heard two popping noises. She turned to Asher and saw that he had been shot. The assailant turned east and ran. She called the police. Asher died from his injuries.

¶ 5    On June 10, 1993, based on a Crime Stoppers report, the police set up surveillance of an apartment that Pursley shared with his girlfriend, Samantha Crabtree. In the early afternoon, Pursley and Crabtree entered a vehicle and Crabtree started driving. While the officers were following them, the vehicle stopped. Pursley jumped out of the car and ran to evade the police. Crabtree voluntarily agreed to go to the police station. On the way, the police conducted a search of Crabtree's apartment pursuant to a search warrant. The police recovered a 9-millimeter Taurus model gun (Taurus). The record indicates that Crabtree purchased the Taurus in February 1993. The record also indicates that the police recovered a 9-millimeter Beretta model gun. The parties

stipulated at trial that during the search the police did not find any newspaper clippings about the murder.

¶ 6    At the police station, Crabtree made a statement implicating Pursley in Asher's murder. Crabtree stated she and Pursley were driving around looking for a house to rob. Pursley was wearing black combat boots, black jeans, a black hooded sweatshirt, and a navy-blue ski mask. Pursley told her to pull over near some apartments and wait there with the car running. Pursley walked toward the apartments. Two or three minutes later, she heard gunshots. One minute later, Pursley returned to the car and he was holding the Taurus in his hand. Crabtree stated that Pursley used the Taurus to shoot Asher. When they were back at home, Pursley took some money out of his pocket. Later that night, they saw a news report about Asher's death and Pursley told her not to say anything to anyone. After being held in jail for almost two weeks on an unrelated armed robbery, Crabtree gave testimony before a grand jury that was consistent with her written statement.

¶ 7    At trial, George testified that the robber was wearing dark clothing and a blue ski mask and that she saw black skin around the eyes. The robber never took the money she had held out with her hand. Before Asher was shot, she heard him say "Oh Christ." After the shooting, the robber turned to the east and started running.

¶ 8    The police department found a spent bullet in the car, and the county coroner recovered a bullet from Asher's shoulder. The police also retrieved two spent bullet casings from the crime scene. A forensic examination of the bullets and the casings indicated that they were fired from the same 9-millimeter caliber weapon and most likely from an Astra, Beretta, or Taurus gun.

¶ 9    Daniel Gunnell, a firearm and toolmark scientist with the Illinois State Police, testified for the State. To determine whether the Taurus was the murder weapon, he relied on microscopic

striations on the bullets caused by lands and grooves and twists in the gun's barrel and on the impressions on the bullets and casings created by the gun's firing mechanism. He fired two test shots and compared those bullets and casings to the recovered bullets and casings. Based on his comparisons, he testified that the bullets and casings were, to the exclusion of all other firearms, fired from the Taurus. On cross-examination, he testified that he did not perform a firing pin comparison test or take photographs of any of the evidence.

¶ 10 Marvin Windham acknowledged that, at the time of trial, he was 23 years old, had been convicted of four drug crimes, and was in jail for charges involving domestic battery and disorderly conduct. Windham testified that he visited Pursley in early April 1993. During the visit, Pursley told him that he had robbed and killed Asher. Pursley pulled a newspaper clipping about the murder out of a drawer. While Windham was at Pursley's apartment, Crabtree came home with a black 9-millimeter gun with brown handles. Windham identified the Taurus in court as resembling the gun he saw at Pursley's apartment. Pursley told him Crabtree took the gun to get adjusted so that the police would not be able to tie him to Asher's murder. Windham anonymously called Crime Stoppers on June 8, 1993, to report Pursley's confession. A few days later, he called Crime Stoppers again and gave his name and stated that Pursley told him that he robbed and murdered Asher. On cross-examination, Windham testified that he received $2650 in reward money for his information and that he had asked the State for leniency for his wife in connection with criminal charges she faced.

¶ 11 Crabtree's trial testimony contradicted her June 1993 statement to the police. At trial, she testified that her statement was coerced and that she and Pursley did not leave her apartment on April 2, 1993. She said that, when the police were interrogating her, she was scared, upset, and very emotional. The police told her that, if she did not cooperate, she would not see her children

again until they were 40 years old. She testified that the police were yelling at her and she would have said anything to make them stop yelling at her. After trial, Crabtree pleaded guilty to perjury for testifying inconsistently at the grand jury proceedings and at Pursley's trial.

¶ 12    Myra and Tracy Foster, the grandmother and mother, respectively, of Pursley's nine-year-old son, Anthony Pursley, testified that on April 2, 1993, Pursley was at his apartment in Rockford with Anthony and Arron Davis, Myra's seven-year-old son. However, on cross-examination, Myra admitted that she sometimes had problems with her memory and that she was not sure Pursley came to her house on April 2, 1993, until her friend, Penny Bunnell, reminded her that she was there that day when Pursley came over. Tracy admitted, on cross-examination, that she initially told investigators that she was not sure if Anthony went to Myra's house on April 2 or 3. Bunnell testified that, on April 2, 1993, she was visiting Myra because it was Myra's birthday. On that day, at about 5:30 p.m., Pursley came over and picked up Anthony and Arron.

¶ 13    Arron, eleven years old at the time of trial, and Anthony, then ten years old, testified that Pursley took them to his apartment the night of April 2, 1993. They both testified that they and Pursley played with Anthony's chemistry set until 11 p.m. on that day and that Pursley never left the apartment. Arron testified that Anthony was at his house the weekend before the murder, and they celebrated Anthony's birthday. Anthony received a chemistry set from Pursley. Anthony came back the following weekend, on April 2, 1993, Myra's birthday. Bunnell was there when Pursley came to pick them up. Anthony testified that he received a chemistry set the weekend before the murder, brought it back to Myra's house the weekend of April 2, 1993, and Bunnell was there when Pursley picked him and Arron up for the weekend. On cross-examination, while Anthony and Arron both exhibited confusion about the exact time that Pursley picked them up on the night of the murder, they consistently indicated that it was no later than 6 p.m.

¶ 14    Sixteen-year-old David Bodell testified that he lived in the neighborhood where Asher was murdered. On April 2, 1993, he heard three gunshots and a woman scream. He said that "not too long" afterward he walked outside and saw a man crouched down in front of a dumpster. About 30 seconds later he heard police sirens and the man began running toward an open field. He said that the man was wearing dark clothing, was about six feet, three inches, tall, and was either white with dark skin or black. Bodell also said that the man had a mustache and that he did not see a ski mask like George described, and he gave inconsistent accounts of his distance from the man.

¶ 15    Finally, Pursley presented his own ballistics expert, Mark Boese, who testified that he fired test shots from the Taurus and compared them to the casings and bullets recovered from the crime scene. Boese explained that there were three or four striations on the recovered casings that were similar to the test casings but that their positions with respect to one another were dissimilar. He also testified that the firing pin impressions were dissimilar. He opined that the crime scene bullets were likely fired from a Taurus gun but not the Taurus. However, he acknowledged that he could not conclusively exclude the Taurus.

¶ 16    Following the jury trial, Pursley was found guilty of first-degree murder and sentenced to natural life without parole. On appeal, this court affirmed his conviction and sentence. *Pursley*, 284 Ill. App. 3d at 600.

¶ 17         B. Initial Postconviction Petitions and First Motion for Ballistics Testing

¶ 18    In July 1997, Pursley filed a postconviction petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 1996)), and the trial court dismissed the petition as frivolous and without merit. We affirmed. *People v. Pursley*, 341 Ill. App. 3d 230, 232 (2003) (*Pursley II*) (citing *People v. Pursley*, No. 2-97-0984 (1999) (unpublished order under Illinois Supreme Court Rule 23)). In March 1999, Pursley filed a second postconviction petition, which

was also dismissed, and we again affirmed. *Id.* (citing *People v. Pursley*, No. 2-00-0551 (2001) (unpublished order under Supreme Court Rule 23)).

¶ 19    Pursley subsequently filed in the trial court a *pro se* motion for forensic testing pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (Criminal Code) (725 ILCS 5/116-3 (West 2000)). *Pursley II*, 341 Ill. App. 3d at 233. He argued that the Taurus, as well as cartridge casings and bullets recovered from the crime scene, were subject to testing under the Integrated Ballistics Identification System (IBIS), as authorized by section 116-3. The trial court dismissed Pursley's petition. On appeal, we affirmed, holding that, under the statute's plain language, section 116-3 did not apply to IBIS testing. *Id.* at 235.

¶ 20               C. Second Motion for Postconviction Ballistics Testing

¶ 21    In 2007, the Illinois legislature amended section 116-3 of the Criminal Code to specifically include IBIS testing, and Pursley filed a new *pro se* motion for ballistics testing. *People v. Pursley*, 407 Ill. App. 3d 526, 528 (2011) (*Pursley III*). The trial court denied the motion in July 2009. *Id.* We reversed on appeal. *Id.* at 539. On remand, the trial court entered an agreed order wherein the parties agreed that an Illinois forensic laboratory would conduct IBIS testing on the recovered bullets and casings as well as the State and defense test-fired bullets and casings. The testing would be performed to assess whether the test-fired bullets and casings were fired from the same weapon as the recovered bullets and casings.

¶ 22                      D. 2014 Postconviction Petition

¶ 23    On September 26, 2014, Pursley filed a successive postconviction petition on the basis of actual innocence. In his petition, Pursley stated that he had received the Illinois forensic laboratory report in December 2011, which included the IBIS analysis. The petition alleged that both the recovered bullets and casings and the test-fired bullets and casings were entered into the IBIS

system and that it had failed to reveal a digital match between the test firings and the recovered evidence. Further, a new forensic examination conducted by the State resulted in the examiner reaching an "inconclusive" determination as to whether the recovered bullets were fired by the Taurus. The State moved to dismiss the petition. The trial court denied the State's motion and set the petition for an evidentiary hearing.

¶ 24                            E. Third-Stage Evidentiary Hearing

¶ 25    A third-stage evidentiary hearing commenced on December 12, 2016, and took place over three consecutive days. The trial judge presiding over the evidentiary hearing (Judge Joseph G. McGraw) was a different trial judge than the one who had conducted Pursley's original 1994 trial (Judge Robert G. Coplan). The following facts are adduced largely from this court's order affirming the trial court's decision to grant Pursley a new trial. *People v. Pursley*, 2018 IL App (2d) 170227-U (*Pursley IV*). John Murdock testified for Pursley as an expert in firearm and toolmark identification. In examining the physical evidence in the case, he used a stereo binocular microscope for observing "all the small marks in the little nooks and crannies of cartridge cases and fired bullets" and a firearm comparison microscope, which could take high-quality digital images and could go up to 120 times magnification, or 120 power. He explained that comparison microscopes from the early 1990s ranged from about 20 to 40 power and there was no digital photography available.

¶ 26    Murdock testified that he was unable to conclude that the two bullets recovered from the crime scene were fired from the same gun as the test-fired bullets. After a comparison, he concluded that there was no significant agreement between them at all. As to the cartridge casings, he concluded that the test-fired casings were fired from a different gun than the recovered casings. He found "sufficient dissimilarities to indicate that [the cartridge casings] were not struck by the

same breech face" or the same firing pins. The test-fired casings had coarse marks and a concentric, circular mark in the middle of the firing pin impression, whereas the recovered casings had only faint circular marks near the periphery of the firing pin impression.

¶ 27    Because his conclusion was the opposite of that of the State's forensic examiners, based on the breech face and firing pin marks, he continued to compare other marks between the test-fired and recovered casings. He found that the test-fired and recovered casings did not have the same firing pin aperture marks, ejector marks, extractor marks, or magazine lip marks. After presenting his conclusions, Murdock testified that it was customary in many laboratories to go through a verification process, where a primary examiner turns over the evidence to another experienced examiner to see if that person agrees with the primary's conclusions, in order to prevent errors in reporting. His work in this case was verified by Chris Coleman.

¶ 28    Coleman, accepted as an expert in firearm identification, testified next for the defense as follows. Coleman examined breech face marks, firing pin impressions, ejector marks, extractor marks, aperture bulge, and magazine lip marks, and he compared those marks between the test-fired cartridge casings and the recovered casings. He came to the same general conclusion as Murdock—that all the test-fired casings were fired from the Taurus and the recovered casings were not fired from the Taurus. He also found no significant agreement between the test-fired bullets and the recovered bullets.

¶ 29    The State called three witnesses, beginning with Gunnell. Gunnell, who had testified in Pursley's original trial, recounted his 1993 examination and his conclusion that the recovered bullets and casings were, to the exclusion of all other firearms, fired from the Taurus. Upon reexamining the evidence in 2012, Gunnell reached the same conclusion as to the recovered casings but reached an "inconclusive" determination on whether the recovered bullets were fired

from the Taurus. He was not sure why "what [he] looked at in 1993 was different than what [he] looked at in 2012", but he offered that the bullets may have been altered by handling or darkened by chemical reactions as they aged.

¶ 30    On cross-examination, Gunnell confirmed that, in 1993, he did not have the benefit of a comparison microscope that could go up to 120 power. At the time, forensic examiners typically used 20 power and there was no high-resolution digital photography available. Regarding his testimony that the bullets may have been altered over time, Gunnell acknowledged that he had not cited any scientific literature to support such alleged degradation and he did not identify any specific place where the bullets had degraded.

¶ 31    Two other State forensic examiners provided testimony. Russell McLain testified that he was assigned to input the evidence from Pursley's case into the IBIS database. He performed test fires on the Taurus in 2011 and ran the IBIS search on the test-fired bullets and casings. After conducting his own comparison, he concluded that the two recovered casings and one of the recovered bullets were fired from the Taurus. On cross-examination, McLain confirmed that (1) his comparison did not constitute a thorough reexamination of the evidence, (2) the IBIS system did not match the recovered cartridge casings and bullets to the test-fired casings and bullets, and (3) he spent little time comparing the firing pin marks and did not compare ejector marks, extractor marks, or magazine lip marks.

¶ 32    Beth Patty testified that she personally test-fired the Taurus in 2012. After examining the 1993, 2011, and 2012 test-fired casings and the recovered casings, she concluded that they were all fired from the same gun. Because her opinion was based on breech face marks, she did not look at extractor, ejector, and magazine lip marks. Those marks could have been created when the bullet was chambered in another weapon but not fired. After examining the bullets, she could not identify

or eliminate the Taurus as having fired the recovered bullets and thus her conclusion was "inconclusive." Patty testified that her comparison microscope went up to 40 power, which was sufficient to reach her conclusions.

¶ 33    On rebuttal, Murdock testified that he agreed with the general proposition that ejector, extractor, and magazine lip marks could be created without firing a weapon, but he disagreed that those marks lacked value in this case. He explained that the casings used in the test firings were marked "NR" for nonreloadable and that they were actually fired from the Taurus. One of the recovered casings had marks in similar positions and relations to the test-fired casings and was also marked nonreloadable. He compared all the marks on that casing. He stated that any chamber marks, marks caused by unloading an unfired cartridge, did not impact his ultimate conclusions in this case.

¶ 34    Based on the foregoing testimony, the trial court awarded Pursley a new trial. The State appealed, but this court affirmed the trial court's determination. See *Pursley IV*, 2018 IL App (2d) 170227-U, ¶ 99.

¶ 35                                    F. New Trial

¶ 36    In 2019, the matter proceeded to a bench trial. The parties stipulated to the evidence and the chain of custody. Mark Schmidt testified that he was the police officer who interviewed Crabtree and took her written statement on June 10, 1993. He typed her statement and had her initial every few sentences. Schmidt testified that Crabtree was generally calm while giving her statement but that she would occasionally start crying. Crabtree was called to testify but she invoked her fifth amendment right against self-incrimination (U.S. Const., amend. V) and refused to answer any questions. The trial court denied Pursley's motion *in limine* to bar Crabtree's original trial testimony and stated that it would be considered. The trial court denied the State's

request to submit Windham's testimony from the original trial, because the State had not shown that it made reasonable efforts to procure his testimony for the new trial. Pursley did not offer the testimony of Anthony or Arron on retrial. The parties stipulated to the admission of the original trial testimony of Bodell, Myra, Tracy, and Bunnell.

¶ 37    Gunnell presented similar testimony to that provided at the evidentiary hearing. He originally concluded that the bullets and casings were fired from the Taurus but, after a reexamination in 2012, determined that the evidence was inconclusive as to whether the recovered bullets were fired from the Taurus. He acknowledged that he does not necessarily look at ejector or extractor marks in making his comparisons. Gunnell opined that he reached a different result in 2012 possibly due to subsequent handling of the evidence. The trial court asked whether, during Gunnell's 2012 examination, there was any evidence of any markings that could have been caused by mishandling the bullets as opposed to firing them through a firearm. Gunnell responded that there were no obvious damage marks and there was nothing that would allow him to definitively state that the character of the bullets had changed.

¶ 38    Patty's testimony was similar to that provided at the evidentiary hearing. In addition, she testified that, when she conducted her examination, she did not see any indication of any degradation in the evidence. She reiterated that, when examining the cartridge cases, she looked at firing pin impressions and breech marks but she did not compare ejector marks, extractor marks, or magazine lip marks.

¶ 39    Murdock testified that he had been doing firearm and toolmark identification for about 52 years. When he started his examination of the recovered bullets and casings, he first made drawings of the markings on them to help determine what had evidentiary value. Murdock explained the various kinds of tool marks that are left on fired cartridge cases—ejector marks, firing pin aperture

marks, breech face impressions, magazine marks, chamber marks, and extractor marks. Murdock used digital photographs presented in court to explain what he looked at during his examination of the evidence. He used a comparison microscope to examine the evidence. Murdock testified that both recovered bullets were fired from the same weapon, because they had the same land impressions. He also concluded, based on his examination of land impressions, that all four test-fired bullets, the two from 1993 and the two from 2011, had been fired from the same weapon. When he compared the recovered bullets to the test-fired bullets, he started out at low magnification and went up to as much as 60X. He concluded that the recovered bullets did not have any significant microscopic agreement with the test-fired bullets and that they had not been fired through the same gun barrel as the test bullets.

¶ 40    Murdock also compared the cartridge cases. Based on his examination of the various markings, he concluded that the recovered cartridge cases had been fired from the same gun. He also noted that, because the recovered casings were "marked well" and those markings were in "excellent agreement," he could expect reproducibility, that is, to see similar markings if a bullet was fired from the same weapon. He also compared the test-fired cartridges and concluded that they were fired from the same weapon and that the Taurus reproduced breech face marks very well. Murdock made casts of the test-fired cartridges from 1993 and 2011 for comparison. Casting allowed for raising up of impressed marks and, when they are lit from the side, it was easier to compare. When he compared the recovered cartridges to the test-fired cartridges, specifically breech face marks, aperture marks, and firing pin impressions, he concluded that the recovered cartridges were not fired from the Taurus.

¶ 41    Murdock testified that he also considered other markings. Because the test-fired cartridges had very reproducible marks, he also looked at extractor and ejector marks. For example, all four

test-fired cartridges had identifiable ejector marks. One of the recovered cartridge cases was the same type of aluminum nonreloadable cartridge case as one of the test cartridges. However, the ejector mark on the recovered cartridge case did not match the ejector marks on the test-fired cartridges. He used the same line of reasoning for magazine lip marks and extractor marks, where he also found no agreement between the recovered cartridges and the test-fired cartridges.

¶ 42    On cross-examination, Murdock acknowledged that his written report indicated that the recovered bullets and cartridges could not have been fired from the Taurus "in its present condition." This was because an examination of the rifling at the muzzle revealed a 360-degree presence of numerous nonmanufactured tool marks parallel to the access of the boring. Nonmanufactured tool marks could be either deliberate or accidental due to careless use of bore cleaning equipment. The markings in the barrel were generally parallel to the bore, which suggested that the markings were due to careless cleaning, because deliberate alterations were much more random. The fact that there were other nonmanufactured tool marks on the breech face also suggested that the nonmanufactured marks were related to the careless use of cleaning equipment. He opined that the difference in markings that led to his conclusions were not related to the nonmanufactured tool marks, because those marks were on the outer rim of the breech face.

¶ 43    On redirect examination, Murdock opined that the reason Patty and Gunnell determined that the recovered and test-fired cartridges were fired from the same gun was because of the way the breech faces of Taurus guns are machined; Taurus guns are machined such that there are coarse marks that move across in an arching fashion. If the recovered and test-fired cartridges are both fired from Taurus guns that were manufactured at about the same time, you would see very similar coarse arching shape breech face marks. Murdock opined that this was what caused the similarity between the breech face marks on the recovered and test-fired cartridge cases.

¶ 44 Coleman also testified at trial. His testimony was similar to the testimony he provided at the evidentiary hearing.

¶ 45 On January 16, 2019, following the bench trial, the trial court rendered its decision. The trial court stated that it considered all the evidence, whether in the form of live testimony, previous transcripts, stipulations, or exhibits. The trial court noted that Pursley's clothing seized during the search warrant did not exactly match the clothing described by George and there was no biological evidence found on the clothing. While Bodell indicated that he saw someone flee southeast across a field after the murder, Crabtree's written statement indicated that Pursley fled northeast back to her car. The trial court stated that since Crabtree refused to answer questions, based on her fifth amendment right, it was not able to assess her credibility. The trial court noted that her testimony from the original trial gave Pursley an alibi for the night of the murder.

¶ 46 The trial court also commented on the firearm and tool mark evidence. The trial court stated that all the experts were qualified, unbiased, and attempting to do their best. The trial court acknowledged that, in Gunnell's 1993 testimony, he concluded that the recovered bullets could have been fired only from the Taurus. However, his conclusions were not documented—there were no drawings, sketches, or photographs. The trial court commented that the evidence in the record from 1993 was scant as compared to more recent standards. The trial court stated that Murdock's and Coleman's qualifications were "without peer" and noted that, when Gunnell conducted his analysis in 1993, he had worked as a firearm and toolmark examiner for only a couple of years. The trial court observed that, after Murdock and Coleman independently reached the conclusion that the recovered bullets and casings were not fired from the Taurus, Gunnell and Patty reexamined the recovered bullets and could no longer conclude that they were fired from the Taurus.

¶ 47    The trial court commented on the issue of the nonmanufactured tool markings and the theory that the Taurus was altered. The trial court noted that if the gun were altered or adulterated in some way before Gunnell's 1993 review, then he would not have been able to identify the recovered bullets and cartridges as having been fired from the Taurus. If the gun were altered or damaged after Gunnell's examination, then Patty would not have been able to identify the cartridge cases as coming from the Taurus in 2011. The trial court thus declined to indulge in any speculation that the Taurus was somehow altered or damaged at some point in time.

¶ 48    The trial court noted that, taking the Taurus as it is, Murdock and Coleman could not state that the recovered bullets were fired from the Taurus. Further, most recently, Patty and Gunnell agreed with that conclusion. With respect to the recovered cartridge cases, the trial court stated that Murdock and Coleman considered things that the State's examiners did not consider, such as ejector marks, extractor marks, and magazine lip marks. The trial court stated that Murdock and Coleman also documented everything such that it "had the benefit of seeing high resolution digital photographs, seeing the imagery with different lighting, from different perspectives, and at different levels of microscopic examination, with the split images, so that the evidence cartridges and the test-fired cartridges could be compared one to another, and so that all the test-fired cartridges could be compared one to another." The trial court noted that, when all the markings were considered, Pursley's experts "demonstrated conclusively" that the recovered cartridge cases were not fired from the Taurus.

¶ 49    In summary, the trial court stated that it was not able to determine which version of Crabtree's story was credible. Further, Patty's and Gunnell's testimony had limitations and no one identified the recovered bullets as coming from the Taurus. After Murdock and Coleman testified at length about their conclusions, with the aid of illustrative digital photographs, the State did not

recall Gunnell or Patty to testify in rebuttal. The trial court also stated that there was no physical evidence linking Pursley to the crime and no eyewitness identifying him as the perpetrator and that the ballistics evidence did not establish proof beyond a reasonable doubt. Accordingly, the trial court found that the State did not meet its burden of proof and entered a judgment of acquittal.

¶ 50                                    G. Certificate of Innocence

¶ 51    On August 15, 2019, after his acquittal, Pursley petitioned the trial court for a certificate of innocence. Pursley incorporated by reference the evidence attached to his previous postconviction petitions, presented at the evidentiary hearing on his successive postconviction petition, and admitted at his 1994 and 2019 trials. Over Pursley's objection, retired Rockford police officers Sam Pobjecky, John Genens, Mark Schmidt, Ron Gallardo, Jeff Houde, Greg Hanson, Jim Bowman, Bruce Scott, and Stephen Pirages were granted leave to intervene. Later, also over Pursley's objection, the Estate of Howard Forrester, the Estate of Gary Reffett, and the Estate of David Ekedahl (all deceased Rockford police officers) were granted leave to intervene. The intervenors filed a response in opposition to Pursley's petition. The State also filed a response in opposition.

¶ 52    In February 2021, the trial court held a nonevidentiary hearing on the petition. The intervenors argued that a finding of not guilty was not the same thing as a finding of actual innocence. They argued that, even though Windham did not testify at the retrial and Crabtree asserted her fifth amendment privilege, the trial court could still consider all the evidence developed during the history of this case. The trial court would have to find that Windham lied repeatedly—during his anonymous tip, his second call to Crime Stoppers, his written statement, his testimony before the grand jury, and most recently in two 2020 depositions in a related federal civil case. The intervenors acknowledged that Crabtree had significant credibility problems but

noted that her original statement and grand jury testimony were consistent with independent statements from Windham. They argued that the ballistics evidence was a wash because, while Pursley's experts opined that the recovered bullets and cartridges were not fired from the Taurus, the State's experts still opined that the recovered cartridge cases were fired from the Taurus. The State argued that a review of the evidence demonstrated, by a preponderance, that Pursley was more likely than not the person who murdered Asher.

¶ 53    Pursley argued that he had nothing to do with Asher's murder and that there was more evidence of innocence than evidence of guilt. The Taurus was determined not to be the murder weapon, there were no eyewitnesses, and he consistently maintained his innocence. Pursley argued that the intervenors were relying on the same bad evidence that led to his wrongful conviction. Pursley noted that the ballistics evidence, specifically the testimony of Murdock and Coleman, established conclusively that the Taurus was not the murder weapon. Pursley also noted that there was no physical evidence and he had five alibi witnesses—Crabtree, Bunnell, Myra, Anthony, and Arron.

¶ 54    On February 26, 2021, the trial court rendered its ruling. The trial court stated that Pursley had to establish his actual innocence by a preponderance of the evidence. The trial court noted that it was very familiar with the evidence that had been presented in the postconviction context and in the retrial. The trial court stated that there was no competent evidence that would cause it to reach a conclusion other than that Pursley was actually innocent. The trial court stated that it believed the lynchpin of Pursley's original conviction was the firearms evidence. The trial court noted that the original determinations made by the State's forensic examiners, which were not thorough or complete, were later modified or abandoned. The trial court found that Pursley's forensic experts

were unbiased and the most qualified it had seen in its years on the bench. The trial court concluded:

> "when I consider the competent, credible evidence presented to the Court and the context in which it was presented, I am convinced by a preponderance of the evidence that Mr. Pursley is actually innocent based on the evidence presented to the Court."

The trial court found that Pursley had met all the requirements of the statute and granted his petition for a certificate of innocence. On March 2, 2021, the trial court entered a written order in accord with its verbal ruling. Following the denial of a joint motion to reconsider, the State and the intervenors (appellants) filed a timely notice of appeal.

¶ 55                                    II. ANALYSIS

¶ 56                              A. Standard of Review

¶ 57     On appeal, the appellants argue that the trial court erred in granting Pursley's petition for a certificate of innocence. The appellants first assert that we should review *de novo* the trial court's decision. The appellants acknowledge that the granting of a certificate of innocence is generally reviewed for an abuse of discretion and that, in a more recent case, one court held that the appropriate standard of review is the manifest weight of the evidence. See *People v. McIntosh*, 2021 IL App (1st) 171708, ¶ 40. The appellants argue that, because the trial court held only a nonevidentiary hearing on Pursley's petition, the trial court's decision is subject to *de novo* review, citing *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 154 (2007) ("Where the circuit court does not hear testimony and bases its decision on documentary evidence, the rationale underlying a deferential standard of review is inapplicable and review is *de novo*.").

¶ 58     The appellants' argument in favor of *de novo* review is unpersuasive. While the trial court held only a nonevidentiary hearing on Pursley's petition for a certificate of innocence, it also

presided over the third-stage postconviction evidentiary hearing and Pursley's retrial. Accordingly, the trial court did not review only documentary evidence. The trial court considered both live and stipulated testimony at the postconviction evidentiary hearing and on retrial. The live testimony included numerous ballistics experts who provided detailed visual comparisons of the ballistics evidence that supported their conclusions. The trial court clearly made credibility determinations. In ruling on Pursley's petition for a certificate of innocence, the trial court specifically explained, "the advantage I think I have in this case is that I'm very familiar with the entire procedural history of this case, post-conviction, and was the trial judge at the time of retrial." Because the trial court had familiarity with the case, *de novo* review is improper. *Cf. People v. Rodriguez*, 2021 IL App (1st) 200173, ¶ 65 (Ellis, J., specially concurring) (*de novo* review proper when the trial court "reviews only a documentary record, hears no new evidence, and has no particularized familiarity with the defendant's case").

¶ 59    Moreover, in *People v. Amor*, 2020 IL App (2d) 190475, this court reviewed the denial of a certificate of innocence for an abuse of discretion (*id.* ¶ 14), even though there was no evidentiary hearing on the petition and the trial court's determination was based only on the record (*id.* ¶ 12 (trial court noting that it considered the parties' filings, the exhibits provided, and the decision at the defendant's retrial, which was presided over by a different trial court judge)). This court denied the request to review the decision *de novo*, because the trial court's ruling did not show that there was any error of law such as a "legal misinterpretation or improper legal conclusion." *Id.* ¶ 14; see also *Rodriguez*, 2021 IL App (1st) 200173, ¶ 45 (a party in a certificate of innocence proceeding cannot alter the standard of review on appeal by choosing to proceed through documentary evidence). Accordingly, we hold that *de novo* review is not the proper standard under the circumstances in this case.

¶ 60    In determining the appropriate standard of review, we note that it is well settled that a trial court's determination granting or denying a petition for a certificate of innocence is generally reviewed for an abuse of discretion. See *Rodriguez*, 2021 IL App (1st) 200173, ¶ 44 (collecting cases, including *People v. Dumas*, 2013 IL App (2d) 120561, ¶ 17). However, more recently, in *McIntosh*, the First District Appellate Court held that the appropriate standard of review in a certificate of innocence case was the manifest weight of the evidence. *McIntosh*, 2021 IL App (1st) 171708, ¶ 40. In determining the appropriate standard in light of *McIntosh*, we note that the abuse of discretion and the manifest weight of the evidence standards of review are both deferential. *People v. Terrell*, 2022 IL App (1st) 192184, ¶ 51. "A trial court abuses its discretion only when its ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Rodriguez*, 2021 IL App (1st) 200173, ¶ 47. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based on the evidence. *People v. Banks*, 2020 IL App (2d) 180509, ¶ 25. In the present case, because we would reach the same result under either the abuse of discretion or the manifest weight of the evidence standard, we need not address the propriety of the standard applied in *McIntosh*. Rather, under either deferential standard, we hold that the trial court did not err in granting Pursley's petition.

¶ 61                                   B. Certificate of Innocence

¶ 62    To obtain a certificate of innocence under section 2-702, a defendant must prove by a preponderance of the evidence that

> "(1) [he or she] was convicted of one or more felonies by the State of Illinois and subsequently sentenced to a term of imprisonment, and has served all or any part of the sentence;

(2)(A) the judgment of conviction was reversed or vacated, and the indictment or information dismissed or, if a new trial was ordered, either [he] was found not guilty at the new trial or [he or she] was not retried and the indictment or information dismissed; ***

(3) [he or she] is innocent of the offenses charged in the indictment or information ***; and

(4) [he or she] did not by his [or her] *** own conduct voluntarily cause or bring about his [or her] *** conviction." 735 ILCS 5/2-702(g) (West 2018).

Here, the parties agree that Pursley has met three of the four elements required to obtain a certificate of innocence under section 2-702(g). The only point of disagreement involves subsection (g)(3)—whether Pursley has proved by a preponderance of the evidence that he is "innocent of the offenses charged in the indictment or information." *Id.* § 2-702(g)(3).

¶ 63    Section 2-702 provides a means to obtain a finding of innocence so that the defendant may obtain relief against the State for wrongful incarceration through the court of. See *id.* § 2-702(a); see also *Betts v. United States*, 10 F.3d 1278, 1283 (7th Cir. 1993) (noting that, under a similar federal statute, "[a] certificate of innocence serves no purpose other than to permit its bearer to sue the government for damages"). Where a petitioner obtains a certificate of innocence, it is "all but certain that the petitioner can obtain a money judgment against the State for wrongful incarceration." *People v. Moore*, 2020 IL App (1st) 190435, ¶ 37. In any hearing on the petition, the trial court is allowed to take judicial notice of prior sworn testimony or evidence admitted in the criminal proceedings that resulted in the alleged wrongful conviction. 735 ILCS 5/2-702(f) (West 2018). The proceedings are civil in nature, and the burden is on the petitioner to prove the requirements to entitle him or her to such relief by a preponderance of the evidence. *Rodriguez*, 2021 IL App (1st) 200173, ¶ 44.

¶ 64    At the outset, the appellants argue that the trial court improperly shifted the burden of proof, requiring them to overcome the not guilty finding made on retrial, rather than requiring Pursley to prove his innocence by a preponderance of the evidence. The record rebuts this conclusion. When it rendered its oral ruling, the trial court first stated:

> "It's important to begin by focusing on what is the standard [of] proof, what's the burden that the petitioner bares [*sic*] in establishing *** his actual innocence and that is a preponderance of the evidence. And that is something that I'm going to keep in the forefront of my mind."

Later, the trial court reiterated that the decision it had to make was different from the decision at the evidentiary hearing or the retrial, because "the question this time is, is Mr. Pursley actually innocent." The appellants' assertion that the trial court improperly shifted the burden of proof is without merit. The trial court clearly stated that it was Pursley's burden to prove his innocence by a preponderance of the evidence.

¶ 65    Finally, the appellants argue that Pursley did not satisfy his burden of proving his actual innocence by a preponderance of the evidence. "A proposition is proved by a preponderance of the evidence when the proposition is more probably true than not true." *People v. Love*, 404 Ill. App. 3d 784, 787 (2010). "Inherent in [certificate of innocence] proceedings, a trial judge must consider and weigh the evidence presented, including admissibility and any credibility issues, to determine if the petitioner has met [his or her burden of proof]." *Rodriguez*, 2021 IL App (1st) 200173, ¶ 44.

¶ 66    In the present case, we cannot say that the trial court's decision, granting Pursley's petition for a certificate of innocence, was arbitrary, fanciful, unreasonable, or not based on the evidence or that the opposite conclusion is clearly apparent. At Pursley's retrial, the State's experts

acknowledged that they could no longer conclude that the recovered bullets were fired from the Taurus. While Patty opined that the cartridge cases were fired from the Taurus, she conceded that she did not analyze ejector, extractor, or magazine lip marks. Murdock and Coleman both opined that the Taurus could not have fired the recovered bullets and cartridge cases. Their conclusions as to the cartridge cases were based, in part, on ejector, extractor, and magazine lip marks that the State's experts did not analyze. The trial court found their testimony thorough, credible, and "without peer," while noting that the testimony of the State's experts "had limitations." The trial court found that Pursley's experts "demonstrated conclusively" that the recovered cartridge cases were not fired from the Taurus. This determination was also supported by the fact that the IBIS system did not match the recovered cartridge casings and bullets to the test-fired casings and bullets.

¶ 67    We acknowledge that the State did not rely solely on ballistics evidence at Pursley's original trial. However, Gunnell's conclusion at that trial, that the recovered cartridge cases and bullets were fired from the Taurus, made the remaining circumstantial evidence weigh in favor of a guilty finding. Specifically, Gunnell's original trial testimony, that the Taurus was "conclusively" the murder weapon, and Boese's original trial testimony, that he could not exclude the Taurus, made it more believable that Crabtree's written statement was true and her recantation less credible, that Windham was telling the truth, and that the alibi testimony was not credible. However, both Crabtree's written statement and Windham's testimony indicated that the murder was committed with the Taurus. In light of the new ballistics evidence that the Taurus was conclusively not the murder weapon, we cannot say that it was unreasonable for the trial court to conclude, by a preponderance of the evidence, that Crabtree's written statement and Windham's

original trial testimony were not credible and that Pursley proved his innocence by a preponderance of the evidence.

¶ 68    The appellants argue that the new ballistics evidence does not provide affirmative evidence of Pursley's innocence. Even though Pursley's ballistics experts concluded that the Taurus was not the murder weapon, the appellants assert that Pursley could have committed the murder using the Beretta that was also found in Crabtree's apartment during the search. This argument is without merit. The assertion that the Beretta was the murder weapon was never raised in any previous trial or postconviction proceedings or in the proceedings on the petition for a certificate of innocence. Arguments not raised before the trial court are generally forfeited on appeal. See, *e.g.*, Ill. S. Ct. R. 615 (eff. Jan. 1, 1967); *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Moreover, Pursley cannot be expected to prove his innocence of a charge based on a theory that was never presented to the trier of fact. See *People v. Palmer*, 2021 IL 125621, ¶ 68 ("it is unreasonable to conclude that the legislature intended subsection (g)(3) to require a petitioner to prove his innocence of a novel theory of guilt that was never charged or presented to the trier of fact). We acknowledge that the original offense as charged in the indictment did not specify the exact gun used in the murder. However, the State argued at Pursley's original trial that the Taurus was conclusively the murder weapon. Crabtree's written statement and Windham's testimony both specifically indicated that the Taurus was the murder weapon. It would be unreasonable for Pursley to be required to prove at this point that the Beretta was not the murder weapon.

¶ 69    In further trying to undercut the impact of Pursley's ballistics evidence, the appellants note that Pursley's experts concluded that the bullets and the casings were not fired from the Taurus "in its present condition." The appellants assert that this does not rule out the possibility that Pursley had the Taurus altered after the murder so that it could not be tied to the crime, as testified to by

Windham at the original trial. We acknowledge that Murdock confirmed that the Taurus had nonmanufactured toolmarks in the barrel and the breech face and that the marks in the barrel could result in microscopic markings on a bullet when it is fired through the gun barrel. However, he also testified, as relevant to the casings, that the nonmanufactured tool marks were in the outer portion of the breech face, not in the central portion which would have come into contact with the primer of the fired cartridge case. Murdock testified that these tool marks thus did not have any effect on the conclusion that the recovered cartridge cases did not match the test-fired cartridge cases. This conclusion alone excluded the Taurus as the murder weapon, regardless of when the nonmanufactured tool marks first came into existence. Further, Murdock opined that the nonmanufactured toolmarks appeared to be the result of careless cleaning, because deliberate alterations were much more random. It was not unreasonable for the trial court to credit this testimony. Moreover, if the nonmanufactured tool marks in the barrel were made after the murder but before the Taurus was confiscated and tested, this would simply cast further doubt on the credibility of Gunnell, who concluded, in 1993, that the recovered bullets were conclusively fired from the Taurus. For these reasons, speculation that the Taurus was altered after the murder simply does not discredit Murdock's and Coleman's conclusions.

¶ 70    The appellants also argue that the alibi testimony had too many conflicts to be credible. First, they argue that Myra's and Bunnell's testimony that Pursley picked up Arron and Anthony about 5 p.m. on April 2, 1993, did not establish an alibi, as the shooting did not occur until about five hours later. However, while their testimony did not provide an alibi, it corroborated Anthony and Arron's testimony that they were picked up by Pursley on April 2, 1993. Although Arron and Anthony exhibited some confusion about the exact time they were picked up on the night of the murder, they consistently testified that Pursley was home on the evening of the murder and never

left the apartment at any time. Finally, as to Crabtree's testimony, the trial court acknowledged that it never had the opportunity to examine her credibility, as she invoked the fifth amendment at retrial, but stated that her testimony at the original trial provided an alibi. It was not unreasonable or clearly improper to credit Crabtree's alibi testimony. In making its determination, the trial court relied most heavily on the new ballistics evidence, which indicated that the Taurus was not the murder weapon. Considering that Crabtree's written statement specifically indicated that the Taurus was the murder weapon, it was not unreasonable for the trial court to find her written statement less credible and her alibi testimony more likely true than not.

¶ 71                                    III. CONCLUSION

¶ 72    For the foregoing reasons, we affirm the judgment of the circuit court of Winnebago County.

¶ 73    Affirmed.

---

## *People v. Pursley*, **2022 IL App (2d) 210558**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Winnebago County, No. 93-CF-1174; the Hon. Joseph G. McGraw, Judge presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | J. Hanley, State's Attorney (Scott P. Robinson and Lucas Brainerd, Assistant State's Attorneys, of counsel), Joel M. Huotari and James P. Devine, of Williams McCarthy LLP, and Robert C. Pottinger and Jody Beilke, of Barrick, Switzer, Long, Balsley & Van Evera, LLP, all of Rockford, and Joshua G. Vincent, Kimberly A. Jansen, and Michael Iasparro, of Hinshaw & Culbertson LLP, of Chicago, for appellants. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Roshna Bala Keen, Rachel Brady, and Lindsay Hagy, of Loevy & Loevy, of Chicago, for appellee. |

---